**Desiree A. JOHNSON, Appellant,**

v.

**Christopher I.S. LEWIS, Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 1, 2005.

Filed March 4, 2005.

---

Megan E. Watson, Philadelphia, for appellant.

Lauren H. Kane, Philadelphia, for appellee.

BEFORE: KLEIN, McCAFFERY and BECK, JJ.

## I.

OPINION BY BECK, J.:

¶ 1 Mother-appellant and father-appellee were married on May 19, 2001. Their only child, James, was born on February 17, 2003. In their divorce, which commenced with the filing of mother's complaint on August 14, 2003, the parties made competing requests for primary physical custody of James. Mother appeals the order of the Court of Common Pleas filed on June 11, 2004, which directs physical custody to be shared equally between the parties on a weekly rotating basis. We affirm.

¶ 2 Mother works as a budget analyst for the City of Philadelphia, Department of Public Health. Her hours are 8:30 a.m. to 5:00 p.m., Monday through Friday. Father is an engineer at the Philadelphia Airport. His hours are unfixed and project-based. At the time of the trial court proceedings, father was working a daytime schedule of 7:00 a.m. to 3:00 p.m., five days a week. This was subject to change to a nighttime schedule of 10:00 p.m. to 6:00 a.m. with as little as two weeks notice, as his assignment to different projects demanded.

¶ 3 Mother stayed home on maternity leave to care for James full-time during his first four months. Upon her return to work on June 25, 2003, James was left in the care of a babysitter from 7:00 or 7:30 a.m. to 4:00 or 4:30 p.m. on weekdays. Father (who was then working the night shift) picked him up from the babysitter's and cared for him alone until mother returned home from work at 6:00 or 6:30 p.m. After about a month, mother and father decided to place James in day care. James attended the day care facility they chose for about two weeks, until the parties separated in August 2003.[1]

¶ 4 The parties' marriage had begun to break down significantly in the months after James's birth. An argument led to a one-time physical altercation in James's presence on July 25, 2003, during which, it was testified, father struck mother in the face more than once and mother threw one or more knives at father. Mother moved out of the marital residence with James on August 4 or 5, 2003, when the child was just shy of six months old.

¶ 5 Both mother and father characterize mother as the child's primary caretaker during the marriage. In addition to the two hours per weekday afternoon spent in father's care for the month that James went to a babysitter, father contributed to James's care by feeding him, bathing him, changing his diapers, and playing with

---

1. Mother made post-separation child care arrangements without consulting father. James has been enrolled at Tuny Haven International Day Care since November 2003.

him. Mother testified that father was a "great" parent for at least the first few months after James was born, though she also testified that the quality of father's caretaking deteriorated as their marriage did the same. Subsequent to the parties' separation, visits between father and son occurred on only a limited basis until a temporary custody order was filed on October 10, 2003. At mother's insistence, visits prior to the temporary order had been held in the residence of the maternal grandfather, where mother and James were staying.

¶ 6 James has suffered three notable injuries while in the care of mother. In March 2003, he fell from her lap while breastfeeding and broke his clavicle. He fractured his tibia when mother and he fell on the steps of a church on December 14, 2003. Finally, James went to the doctor for treatment after his fingers were caught in a vacuum cleaner on April 5, 2004.

¶ 7 Mother testified at trial that she and James were living in a residence recently occupied by her father, who had just purchased and moved to another property. She acknowledged that her father owned a gun, but could not say where it was stored and indicated she was not concerned that the gun posed a hazard to James in the residence where they were living.

¶ 8 The October 2003 temporary custody order, to which the parties agreed, established mother as James's primary physical custodian. Father had custody under the order on weekdays from 2:30 p.m. to 4:30 p.m. and every other weekend, 8:30 a.m. to 5:00 p.m. on Saturdays and 9:00 a.m. to 5:00 p.m. on Sundays. After a trial, the Court of Common Pleas, Philadelphia County, altered the arrangement under the temporary order and ordered shared physical custody, with James alternating weeks at his parents' separate homes.[2]

¶ 9 Though he had originally wanted primary custody, father is satisfied with the trial court's decision. Mother has filed this timely appeal, requesting remand for a new hearing and the reinstatement, for the meantime, of the October 10, 2003 temporary custody order giving her primary physical custody.[3] In general, she challenges the trial court's consideration of factors going to the child's best interest and the development of the record below.

## II.

¶ 10 We review the trial court's custody order for abuse of discretion. *Kirkendall v. Kirkendall,* 844 A.2d 1261, 1263 (Pa.Super.2004). In a custody dispute, a trial court must determine what arrangement is in the best interest of the child, conducting a "searching inquiry into all the facts and circumstances" having an impact on the child's physical, intellectual, moral and spiritual well-being. *Jackson v. Beck,* 858 A.2d 1250, 1252, 1253 (Pa.Super.2004). As this Court has noted:

> We consistently have held that the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives [of] the parties concerned. Indeed, the knowledge gained by a trial court in observing

2. The final order also provides that on each Wednesday, the non-custodial parent for that week has custody after work (picking up the child from day care) until 7:00 p.m., and that either party is permitted to visit the child at day care during the week. It further sets up a custody schedule for holidays.

3. The trial court denied mother's motion for reconsideration of the order without a hearing on July 1, 2004. The trial court and this Court also denied mother's requests for stays of the order pending appeal. Thus, the order in question has been in effect since its entry.

witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Id.* at 1254.

¶ 11 Our standard of review is linked closely with our scope of review in these matters. We may not make an independent determination of the facts different from the factual findings of the trial court, unless there is "no competent evidence" to support what the trial court has found. *Id.* at 1252 (quotations omitted). The fact-finder is free to believe all, part, or none of the evidence, and this Court will not disturb the trial court's credibility determinations. *Id.* at 1254. We may interfere with the trial court's factual conclusions, deductions and inferences only where they are unreasonable in light of its factual findings, which would represent a gross abuse of discretion. *Id.* at 1252.

## III.

### A. Psychological Factors Relating to Role of Primary Caretaker

¶ 12 Mother-appellant first argues that the trial court abused its discretion by failing to consider the potential psychological fallout for James of a switch to shared custody, given his young age and especially that mother had been his primary caretaker.[4] She relies particularly on *Wiseman v. Wall*, 718 A.2d 844 (Pa.Super.1998), *Fisher v. Fisher*, 370 Pa.Super. 87, 535 A.2d 1163 (1988) and *Mumma v. Mumma*, 380 Pa.Super. 18, 550 A.2d 1341 (1988). In her view, *Fisher* and *Mumma* stand for the proposition that courts

should be hesitant to order shared physical custody.

¶ 13 We recently reiterated the principle, first enunciated in *Commonwealth ex rel. Jordan v. Jordan*, 302 Pa.Super. 421, 448 A.2d 1113, 1115 (1982), that "where two natural parents are both fit, and the child is of tender years, the trial court must give positive consideration to the parent who has been the primary caretaker." [5] *Kirkendall*, 844 A.2d at 1264. The trial court should not disregard "the benefits likely to flow to the child from maintaining day to day contact with the parent on whom the child has depended for satisfying his basic physical and psychological needs." *Id.* This positive consideration is not a mechanical presumption, but part of "a close scrutiny of all particular facts relevant to determining the child's best interests." *See Wiseman*, 718 A.2d at 848 (quoting *Jordan*, 448 A.2d at 1117).

¶ 14 In *Wiseman*, the trial court made an order of shared physical custody similar to the one in this case. The fifteen-month-old child involved was to rotate between his father's and mother's homes on a weekly basis. *Id.* at 846. We reversed and returned primary physical custody to the mother, who had been the child's primary caretaker. *Id.* at 851.

¶ 15 A broad reading of *Wiseman* may seem to suggest that a schedule of weekly rotating shared custody is so inherently damaging to an infant child that it is never appropriate. However, it was a combination of factors that led this Court to reverse the trial court in that case. *Wiseman* must be viewed in the context of its

---

**4.** For ease of disposition, we have reorganized mother's ordering and presentation of the issues.

**5.** Father-appellee correctly points out that *Jordan*, in *dictum*, explicitly excepted shared custody situations from the primary caretaker

doctrine. 448 A.2d at 1115, n. 2. At least one subsequent case, however, has mandated positive consideration of this factor even in shared custody appeals. *Wiseman*, 718 A.2d at 847, 850.

specific facts.[6] Notably, the father in that case, who had been in "a limited non-romantic sexual relationship" with the mother, was not involved in the child's life until he was six months old, and then only after a paternity adjudication. 718 A.2d at 846, 848. Considering the differences between the situation here and that in *Wiseman,* we find *Wiseman*'s analysis of the psychological impact of rotating shared custody to be inapplicable.

■ ¶ 16 In this case, James was fifteen months old when the custody order issued. Mother had been the primary caretaker from his birth. She had been primary custodian since the breakup of the marriage, or for about nine months.[7]

¶ 17 There was an absence of expert testimony (and an absence of analysis in the trial court's opinion) on the possible psychological impact to James of a custody change, and of weekly rotations in custody. Yet it is doubtful that the shift to shared custody destabilized his "physical and psychological self." *See Kirkendall,* 844 A.2d at 1264. Mother was primary caretaker, but father had contributed to James's care from his birth, and remained a steady presence for James even after the parties' separation. Besides, under the order here

James continues to live with his mother half the time and to see her at least once weekly. He lives full-time in the same city where he always has and continues to attend his relatively long-standing day care.

¶ 18 We find that the trial court properly placed its positive consideration of James's age and mother's role as primary caretaker in the context of all the facts and circumstances related to James's best interests. *See Jackson,* 858 A.2d at 1252; *Wiseman,* 718 A.2d at 847. The court found, based on its opportunity to observe the parties' testimony and demeanor, that father is a caring and capable custodian. Trial Court Opinion at 9–10. It could further reasonably have found that James would benefit from increased paternal contact more than he would suffer psychologically from decreased contact with his mother. Also, there is reason from the record to be troubled over the child's safety in mother's care. *Id.* The court was within its broad discretion to find that these factors, which favored shared custody, outweighed mother's status as primary caretaker. *See Johns v. Cioci,* 2004 PA Super 492 ¶ 16, 865 A.2d 931 (citing *Jackson,* 858 A.2d at 1254).[8]

---

**6.** We have long disfavored basing custody decisions on any one factor, such as the age of a child. *See, e.g., Wiseman,* 718 A.2d at 848; *Jordan,* 448 A.2d at 1117; *In re Custody of Temos,* 304 Pa.Super. 82, 450 A.2d 111, 121–22 (1982).

**7.** However, mother stayed home with James only during the first four months of his life. Since then, James has spent at least eight hours of each weekday in secondary child care. Therefore, mother's status as primary caretaker and custodian, while still warranting positive consideration, was entitled to less weight. *See Wiseman,* 718 A.2d at 847 (explaining that "the primary caretaker doctrine also includes the ... quantity of care actually given to the child by the parent as opposed to the supervisory care by others while in the parent's custody").

**8.** It is obvious to this Court how the facts of this case are distinguishable from those in *Fisher* and *Mumma,* in which shared custody orders were found inappropriate. *Fisher* involved a yearly rotating shared custody order for a school-age child who had been with his father as primary caretaker for four years. 535 A.2d at 1164, 1165–66. The mother lived in St. Louis and the father in Philadelphia. *Id.* at 1164. In *Mumma,* the parties had already attempted and encountered difficulties with shared custody, and a psychologist had testified that the child involved needed a single "home base" during the school year. 550 A.2d at 1342, 1344.

As for the broader principles of *Mumma* and *Fisher,* we do not agree with appellant-mother that they represent hesitancy in the law with regard to shared custody arrange-

### B. Father's Night Shifts

¶ 19 Mother next asserts that the court erred by awarding equally shared physical custody to father even though he may work nights in the future.

¶ 20 We held in *Gerber v. Gerber*, 337 Pa.Super. 580, 487 A.2d 413, 416 (1985), that where, as here, other factors favor awarding custody to a parent, his "work schedule may not deprive that parent of custody if suitable arrangements are made for the child's care in his ... absence." Mother argues though that the trial court failed to develop the record sufficiently as to the suitability of father's child care arrangements during his possible night shifts. *See id.* The trial court does indeed have a responsibility to determine the best interests of the child on the basis of a complete and detailed record covering all the pertinent facts and circumstances of the case. *See, e.g., Moore v. Moore,* 535 Pa. 18, 26–27, 634 A.2d 163, 167 (1993).

¶ 21 In the event of a change in his work schedule, father testified that he would hire a live-in nanny, and that he had already made inquiries about his child care options. The trial court found him credible and that this arrangement was suitable, and we cannot say that this was unreasonable on the facts of this case. It is difficult to see what other information the trial court might have obtained about the suitability of father's child care arrangements, as father had not yet hired a nanny or even been put in a position (*i.e.,* on the night-shift schedule) to hire a nanny. Therefore, the ordering of shared physical custody despite the probability that father would work some nights in the future, and the fact that he was not able to provide additional information about his child care arrangements in that event, was not an abuse of discretion.

¶ 22 Mother's next related claim is that even if shared custody was generally appropriate here, the court should have made provision for mother to have physical custody during the periods when father works the night shift.[9] This raises the broader issue whether the court erred by allowing any third party—even a competent nanny—to take care of James when father is working overnight and mother, a fit parent, is available to watch James instead. Mother submits that *Gerber's* protection of a working parent's entitlement to custody where he or she has secured adequate child care, 487 A.2d at 416, does not cover a situation in which the non-custodial parent is available to care for the child when the custodial parent is working. She relies primarily on *Wiseman,* and suggests that *Temos* also supports her theory. Contrary to mother's contention, however, both of these precedents support the trial court's decision in this case.

ments. The holding of *Mumma* is that this Commonwealth's policy of preserving without interference the relationship between parent and child does not *require* equal division of physical custody between parents. *Id.* at 1343. Likewise, *Fisher* states that there is no *requirement* to order shared physical custody where the trial court finds the parties to be equally skilled parents. 535 A.2d at 1165. In our view, both cases simply conform to the well-established principle that each child custody matter is unique and to be decided on a case-by-case basis according to the best inter-

ests of the particular child involved, without presumptions or mechanically applied rules. *See Jackson,* 858 A.2d at 1253; *Jordan,* 448 A.2d at 1117.

9. It is unclear whether mother believes the proper order would give mother full-time physical custody during these periods, with father merely to have visitation, or that it would be preferable to have mother act in the stead of a babysitter overnight. No clarification is required, however, as the same analysis applies in either case.

¶ 23 In *Wiseman,* we found that an award of primary custody to the mother, who worked at night and was available for much of the day, was preferable to shared custody because it would ensure the child was less in the care of a third party during his *waking* hours than he would be if he attended day care during the alternating custody weeks of his working father. 718 A.2d at 850. Similarly, we noted in *Temos* that by changing custody erroneously from mother to father, both of whom worked, the trial court "did not ensure that [the children] would have any more time with the father than they now have with the mother. It only ensured that they would have a few hours a day with the father's wife instead of with a babysitter." 450 A.2d at 125. Both cases hold, therefore, that changes in custody can be uselessly disruptive when the parent to whom custody is newly granted will spend waking time with the child equal to or less than that spent by the fit parent who previously had custody.

¶ 24 During his weeks with mother, James is in day care Monday through Friday from before 8:30 a.m. until after 5:00 p.m., or about eight and a half hours a day. With father when he is on the day shift, as he was when the trial court's custody order was filed, James is in day care from before 7:00 a.m. until after 3:00 p.m., or about eight hours.[10] With father if and when father is ever on the night shift, James will be in the care of a nanny and/or his normal day care facility from before 10:00 p.m. until the following afternoon (including time for father to sleep when he gets home from work after 6:00 a.m.). We estimate that James would spend perhaps ten waking hours (5:00 a.m. to 3:00 p.m.) in the care of a third party.

¶ 25 Thus, even when father is on the night shift, the total number of *waking* hours James spends in the company of one of his parents under the trial court's order remains substantially the same from week to week. As his waking time with his mother would not significantly increase if she were to have custody when father goes on night shift, a switch in James's familiar weekly rotating schedule would not be particularly useful. *See Wiseman,* 718 A.2d at 850; *Temos,* 450 A.2d at 125. We are in agreement with the trial court that such an arrangement actually would be overly disruptive, unpredictable, and confusing for James. Trial Court Opinion at 12. Maintaining the stable consistency of weekly shifts in physical custody, even if father should have to alter his work schedule, is reasonably in James's best interest.[11]

## C. Father's New Living Arrangements

¶ 26 As previously noted, the trial court has a responsibility to develop the record fully with all relevant facts. *Moore,* 535 Pa. at 26–27, 634 A.2d at 167. At the time of the trial, father was expected to vacate the marital residence so that it could be sold as part of the parties' divorce. Mother submits that insufficient evidence was adduced on his future living arrangements for shared custody to be appropriate.

¶ 27 As of the time of the custody trial, the marital home was not yet listed for sale, and father had made no arrangements for his future residence. He testi-

---

10. Therefore, on father's schedule as it stood when the trial court issued its order, it was at least possible that James actually would spend more time with father during his weeks than with mother during hers.

11. If the situation should arise in the future, however, and it then appears from experience that staying overnight with a live-in nanny is not in James's best interest, mother will be free to file a motion for modification of the custody order at that time.

fied that he planned to continue residing in Philadelphia.

¶ 28 We see no reason why this testimony, found to be credible by the trial court in its position as fact-finder, is insufficient. It represents all the information on the subject of father's future living situation that was available at the time of trial. The trial court was within its discretion to find that father's current living conditions (in the marital home) were, and future living arrangements were likely to be, suitable.

### D. The Parties' Ability to Cooperate Minimally

¶ 29 Last, appellant argues that the trial court abused its discretion in ordering shared custody without adequate record support for a finding that the parents can sustain a minimal degree of cooperation. This is one of four findings a trial court is required to make before it may order shared custody.[12] *Wiseman*, 718 A.2d at 848.

¶ 30 We reject the notion that there was nothing in the record from which the trial court reasonably could have concluded that a minimal degree of cooperation is possible here. While there was certainly evidence that the parties have difficulty cooperating (including their physical altercation in James's presence, failure to communicate about James's child care placement subsequent to the separation, and disagreements about day care and feeding of James), there was also evidence of some basic cooperation.

¶ 31 For example, the parties managed on their own to arrange some visitation between father and son shortly after their separation in August 2003. They both attended an appointment at the pediatrician's office not long after separating. Mother telephoned father on more than one occasion to inform him of James's medical status, as when he caught his fingers in a vacuum cleaner in April 2004 and when he fractured his tibia after falling down the steps at church in December 2003. The parties also spoke on the telephone about day care in May 2004.

¶ 32 In addition to these specific instances of cooperation, mother and father were once married in a loving relationship. They know each other well. In that sense, this case again may be distinguished from *Wiseman*, in which this Court found insufficient evidence of minimal cooperation. There, the parties had never really been in a relationship and had virtually no history of communicating except through legal papers and third parties. *Id.* at 848–49. On these different facts, the trial court did not abuse its discretion as to the fourth required factor for shared custody.

### IV.

¶ 33 In sum, the trial court did not fail to adequately consider the psychological importance of the primary caretaker in this case, especially in light of the other factors that weighed in favor of assigning greater custody rights to father. It was reasonable for the court to determine that a consistent weekly rotating schedule was preferable to a different schedule should father have to work at night, even if this would require a nanny to care for the child when mother is available to care for him too. The record was adequately developed

---

12. The other three requirements are: "(1) both parents must be fit, capable of making reasonable child rearing decisions and willing and able to provide love and care for their children; (2) both parents must evidence a continuing desire for active involvement in the child's life; (3) both parents must be recognized by the child as a source of security and love." *Wiseman*, 718 A.2d at 848. Mother does not challenge the trial court's assessment of any of these three factors in this case.

as to father's child care and future living arrangements. Finally, there was a basis in the evidence to conclude the parties were capable of minimum cooperation. In light of these conclusions, we find that the trial court did not abuse its discretion by ordering shared physical custody on a weekly rotating basis.

¶ 34 Order affirmed.

¶ 35 KLEIN J. concurs in the result.