**Amrhein v. Amrhein**

*Christina M. Amrhein,* pro se.
*Iphigenia Torlidas,* for defendant.

WECHT, *J.,* September 21, 2006—Plaintiff Christina M. Amrhein (Mother) appeals this court's May 16,

2005 order awarding primary custody of the parties' two minor children to defendant Michael Joseph Amrhein (Father).

## BACKGROUND AND PROCEDURAL HISTORY

The parties married on August 29, 1992. Two children were born of the marriage: Brittany (date of birth—09/17/89) and Dayna (date of birth—09/17/96). Father filed protection from abuse (PFA) petitions against Mother that resulted in the entry of temporary orders against her on September 2 and October 14, 2003 (per the Honorable Kathleen Mulligan, J., and the Honorable Randal Todd, J., respectively).[1] By consent order dated October 22, 2003, Father was granted primary custody of the children. (R1. at 7.) The October 22, 2003 order (per the Honorable Michael O'Malley, J.) vacated the temporary PFA order against Mother. *Id.* The order provided, inter alia, that Mother would not return to the marital residence and that Brittany and Dayna would remain there in the primary custody of Father. *Id.* The order gave Mother partial custody on weekends. On October 30, 2003, Mother filed a complaint in divorce. On November 13, 2003, Mother filed a complaint for custody of the two children. (R1. at 7.)

On December 9, 2003, Mother filed a PFA petition against Father on behalf of Brittany. (R1. at 7.)[2] By

---

1. As indicated *infra,* text at 2 and 4, final PFA orders were not entered on Father's behalf.

2. Mother's divorce complaint was filed at FD no. 03-1286-003. Mother's PFA petition filed on December 9, 2003 was filed at FD no.

consent of the parties, the final hearing date on Mother's petition was continued from December 15, 2003 to January 7, 2004. Following an evidentiary hearing on the record on that date, this court dismissed Mother's petition.[3] The January 7, 2004 order further directed the parties to obtain individual counseling for Brittany, as well as family counseling.

Mother procured the filing of criminal charges against Father in connection with the December 9, 2003 incident that formed the basis of Mother's PFA petition. A no contact order barring Father from having contact with Brittany issued with the criminal complaint. (R1. at 92-93.) While the criminal case was pending, Mother kept both children in her custody from December 9, 2003 to May 24, 2004. (R1. at 7-8.) With the exception of some time with Dayna at Christmas and Easter, Father did not have contact with the children during that period. (R1. at 8.)

Following a custody conciliation in this court's generations department, by order dated March 8, 2004,

03-1763-003. Although this court entered an order on March 4, 2004 that all future documents should be filed at FD no. 03-1763-003, it appears from a review of both electronic dockets that documents continued to be filed at both FD numbers.

3. Mother appealed this court's order dismissing her PFA petition. This court's February 17, 2004 opinion filed pursuant to Pa.R.A.P. 1925(a), which contains a detailed background on the PFA petitions filed up to that date as well as the circumstances surrounding the December 9, 2003 petition, is available at *Amrhein v. Amrhein,* no. FD 03-1763-003, (C.C.P. Feb. 17, 2004), 152 Pitt. L.J. 245 (Oct. 15, 2004), available at http://www.alleghenycourts.us/opinions/family_adult/ (Wecht)%20Amrhein%20v%20Amrhein.pdf. Mother subsequently withdrew her PFA appeal, which was docketed at 50 WDA 2004.

Father was directed to contact Barbara Madaus (a licensed therapist) for family counseling with the goal of re-unification with the children. On May 19, 2004, Father presented a "motion for special relief" requesting that this court enter an order directing Mother to return Dayna to the marital residence and scheduling a contempt hearing to address Mother's failure to comply with the provision of this court's January 7, 2004 order requiring family counseling. Father alleged that Mother would not allow Father and Dayna to meet with Dr. Madaus outside of Mother's presence, and that Mother had failed to bring the children to some of the sessions.

On May 19, 2004, this court entered an order directing Mother to return Dayna to the marital residence on May 24, 2004. (R1. at 8.) The issue of Brittany's return to the marital residence necessarily was deferred until after the June 29, 2004 trial date on the simple assault charges filed by Mother against Father in connection with the December 9, 2003 incident.[4] (R1. at 8, 13.) On June 29, 2004, the Honorable Kathleen A. Durkin granted Father's motion for habeas corpus, and dismissed the criminal charges.

On June 18, 2004, Father obtained a temporary PFA order against Mother (per the Honorable Kevin G. Sasinoski, J.). (R1. at 8.) The parties were scheduled to appear at a final hearing before the undersigned on June

---

4. This explains the temporary "separation of the siblings" noted by the Superior Court at paragraph 4 of its June 26, 2006 opinion concerning Mother's in forma pauperis status. *Amrhein v. Amrhein,* 903 A.2d 17, 18 (Pa. Super. 2006).

28, 2004. In the meantime, by order dated June 22, 2004, pursuant to an "emergency motion for special relief" filed by Mother, this court provided that Mother could continue to have custody of Dayna on weekends and Tuesday evenings for dance class and that this exercise of custody would not be considered to violate the June 18, 2004 temporary PFA order.[5] The court also granted Mother make-up time for missing the weekend of June 18. The final hearing on the June 18, 2004 PFA was continued three times. The final hearing on the PFA, as well as on Father's complaint for indirect criminal contempt (filed on July 21, 2004), ultimately was conducted on September 15, 2004.

Following hearing on September 15, 2004, this court dismissed the PFA and indirect criminal contempt petitions. The order further provided that, on an interim basis pending custody trial, the parties were to share legal and physical custody of both children on an equal 50/50 basis, with a week-on/week-off schedule. The Sunday noon exchanges were to take place at the Ross Township Police Station if the parties could not otherwise agree on a location. The parties were directed immediately to commence co-parenting counseling with Jeffrey Freedman Ph.D. The parties also were directed to continue or commence individual therapy and to ensure the continuation of therapy for both children. The parties were specifically directed not to use the police to mediate custody disputes.

---

5. On June 1, 2004, the court ordered psychological evaluations.

On Father's motion, a custody trial was scheduled for May 3, 4 and 5, 2005.[6] Following trial, on May 16, 2005, this court entered an order awarding primary physical custody of the children to Father.[7] This court awarded shared legal custody to the parties. The custody schedule for the school year set forth in the order provides that Father is to have custody of Dayna from Sunday evening through Friday afternoon during the school year. Mother is to have custody of Dayna from after school on Friday until Sunday at 7 p.m. Father is to have custody of Brittany from Sunday evening through Thursday morning. Mother is to pick Brittany up from school on Thursday and drop her off (with Dayna) at Father's on Sunday at 7 p.m. The custody schedule further provides that Father shall retain custody of the children on the first weekend of every month.

The custody schedule for the summer set forth in the order provides that, if either child is directed to attend summer school for low grades by the Pittsburgh public schools, the school year custody schedule shall remain in place. Mother is entitled to a two-week summer vacation with the children as long as it does not conflict with summer school. If neither child is directed to attend summer school, the order provides that the parties

---

6. At trial, Mother was represented by Daniel P. Buzard, Esquire. By motion granted, Mr. Buzard withdrew as counsel on October 14, 2005.

7. This court also issued an order on May 16, 2005 granting in part and denying in part Father's motion for sanctions. That order is the subject of a separate, but consolidated, appeal (docketed at 1024 WDA 2005) and is addressed in an accompanying opinion.

shall alternate custody in the summer on a week-on/ week-off basis starting each Sunday at 12 p.m. Each party is entitled to a two-week summer vacation with the children in that scenario.

Additionally, the order permits three phone calls per day from the noncustodial parent to the custodial parent's home, for a maximum of 45 minutes total for all three calls. The order allows Father to discipline Brittany by removing her cell phone, and prohibits Mother from replacing the removed cell phone. The parents were prohibited from encouraging the children to defy the rules of the other parent. Each parent was ordered to keep the other parent informed of medical, religious, academic or disciplinary issues. The parents were ordered (again) to desist from involving the police in the custody matter. The order provides that Brittany is to continue to treat with her psychiatrist.

Further, the parents were ordered to prepare a joint written parenting plan, which was proposed by Mother. The parents were to agree on common rules to be applied to both children. A copy of the jointly-approved plan was to be submitted to this court by June 24, 2005. If the parents could not agree on a parenting plan, either party could move to appoint a mediator. Upon Father's motion, a mediator was appointed on July 11, 2005.

On June 9, 2005, Mother filed both a petition to proceed in forma pauperis (IFP) in this court, and a notice of appeal to the Superior Court from this court's May 16, 2005 custody orders. On June 22, 2005, this court denied Mother's IFP petition. On July 21, 2005, Mother filed a notice of appeal from the IFP denial. All

proceedings on Mother's appeal of the May 16, 2005 custody orders awaited the Superior Court's disposition of Mother's IFP appeal, which was docketed at 1281 WDA 2005. On September 14, 2005, this court filed its opinion on the IFP appeal pursuant to Pa.R.A.P. 1925(a). On June 26, 2006, the Superior Court filed an opinion reversing this court's IFP decision, and remanding for reconsideration. *Amrhein v. Amrhein,* 903 A.2d 17 (Pa. Super. 2006). Upon reconsideration, this court granted Mother's IFP petition by order dated June 27, 2006.

The Superior Court's June 26, 2006 opinion also directed this court to file its opinion(s) pertaining to the May 16, 2005 custody orders within 30 days of receiving the transcripts from the May 3-5, 2005 trial. By order dated July 27, 2006, this court directed Mother to file a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b). Mother submitted her response to this court on August 15, 2006. This court received the last of the May 3-5 trial transcripts on August 30, 2006.[8]

---

8. The transcripts of the May 3-5 trial were prepared by six different court reporters. The May 5 afternoon session transcript was filed on August 1, 2006 and is cited as R6. The May 3 morning and afternoon sessions transcripts were filed on August 11, 2006 and are cited as R1. and R2., respectively. The May 5 morning session transcript was filed on August 23, 2006, and received by this court on August 28, 2006, and is cited as R5. The May 4, 2005 afternoon session transcript was filed on August 25, 2006, received by this court on August 29, 2006, and is cited as R4. The May 4, 2005 morning session transcript was filed and received by this court on August 30, 2006 and is cited as R3.

## ISSUES RAISED ON APPEAL

In her "response to July 27, 2006 order from Judge Wecht," received on August 15, 2006, Mother asserts that this court erred in the following particulars:

"(1) Christina M. Amrhein, appellant, respectfully submits that the trial court erred in awarding primary physical custody of the parties' minor children to Father, Michael J. Amrhein. Christina M. Amrhein's custodial time has gone from the status quo of 50 percent to less than 20 percent of the average monthly time with Dayna Amrhein (parties' youngest minor daughter), and 29 percent of the average monthly time with Brittany Hussar (parties' oldest minor daughter).

"(2) Christina's custodial time during the school year begins with oldest daughter, Brittany Hussar, on Thursdays, while Mother's employer requires her to work until 8 p.m.

"(3) Christina's custodial time during the school year separated the children.

"(4) Penalizing Mother, Christina M. Amrhein, and children with a drastic penalty of limited custody time for the entire summer (as opposed to the 'week-on/week-off' custody rotation), if either child is directed to summer school.

"(5) Preventing Mother, Christina M. Amrhein, from enrolling either child in extracurricular activities without Father's expressed approval.

"(6) Finding the 'Mother improperly involved or encouraged or permitted' police involvement in violation of the September 15, 2005 order.

"(7) Awarding a City of Pittsburgh police officer, Officer Daniel Stangrecki, a fee for testifying as an off-duty officer in disregard to the fact that he was subpoenaed.

"(8) Sanctioning Mother with loss of custodial time.

"(9) The imposition of attorney fees being awarded to Father, Michael J. Amrhein."[9]

## SCOPE AND STANDARD OF REVIEW

A trial court's custody order is subject to "the broadest type" of review, and "the appellate court is not bound by the deductions or inferences made by the trial court . . . ." *Liebner v. Simcox,* 834 A.2d 606, 609 (Pa. Super. 2003), quoting *MacDonald v. Quaqlia,* 442 Pa. Super. 149, 154, 658 A.2d 1343, 1345 (1995).

"However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion." *Id.*

---

9. The issues raised on appeal in points 8 and 9 relate to the May 16, 2005 order regarding Father's motion for sanctions, and accordingly are addressed in the accompanying opinion at 1024 WDA 2005, rather than herein.

The appellate court will not make independent factual findings unless there is no competent evidence to support the trial court's findings. *Johnson v. Lewis,* 870 A.2d 368, 372 (Pa. Super. 2005).

The best interest of the child standard requires that all factors be considered, and the trial judge must evaluate "whether the relationship between the disputing parties has an adverse effect on the child." *T.B. v. L.R.M.,* 874 A.2d 34, 38 (Pa. Super. 2005).

## DISCUSSION AND ANALYSIS

The first issue Mother raises in her Rule 1925 response relates to the reduction in custodial time with the children. With respect to this issue, this court concluded that the best interests of Brittany and Dayna are served by Father having primary physical custody.

This court became convinced from the evidence in this case that Brittany is incorrigible, ungovernable, and in crisis. This court refrained from ordering the filing of a dependency petition only because this court opted to implement the parenting plan suggested by Mother in her proposed order. That plan includes a number of provisions that may assist the parties and their children in moving forward in a more productive way, including counseling, consultation, and monitoring by a mediator.

This court considered continuing the week-on/week-off schedule mandated by this court's interim order of September 14, 2004. However, a number of points militated against such an outcome. First, the expert testimony and report of the court-appointed psycho-

logical evaluator, Eric Bernstein Ph.D., compellingly showed that the best interests of the minor children are served by awarding primary custody to Father. (R3. at 90-92, 98-99.) Second, with Mother's acquiescence and in some cases encouragement, Brittany has grown more out of control as this case has progressed, rather than less. Brittany's studies have suffered, her grades have plummeted, and her emotional state has deteriorated. (R1. at 89-91, 93-94.) Interestingly, the records show that her grades have generally been better while in Father's custody, and that Father and his paramour actively encourage and foster Brittany's education, while Mother and her paramour have a lackadaisical attitude about this subject. (R1. at 91-93, R6. at 167-68, R5. at 80-95.) The same goes for assistance with Dayna's homework. (R5. at 80.) Fortunately, Dayna has not yet exhibited the problems manifested by Brittany.

Notwithstanding the court-appointed psychological expert's recommendation, this court considered splitting the two minor children. This court considered this because Brittany has, again with Mother's acquiescence, exhibited a tendency to attempt to alienate Dayna from Father. With respect to issue no. 3, while this court considered splitting the children, as well as considering the filing of a dependency petition as mentioned above, this court ultimately concluded that keeping the children together (and providing an additional overnight with Mother for Brittany), would be in their best interests. In doing so, the court was mindful not only of the relevant literature,[10] but also of Pennsylvania law's policy

10. See *e.g.,* Joel V. Williams, Comment, *Sibling Rights to Visitation: A Relationship Too Valuable To Be Denied,* 27 *U. Tol. L. Rev.* 259,

"to permit siblings to be raised together whenever possible." *Johns v. Cioci,* 865 A.2d 931, 942 (Pa. Super. 2004) (citing *Wiskoski v. Wiskoski,* 427 Pa. Super. 531, 535, 629 A.2d 996, 998 (1993)); *Pilon v. Pilon,* 342 Pa. Super. 52, 55, 492 A.2d 59, 60 (1985).

This court concluded that the children are entitled to an opportunity to love both parents, and to benefit from the love of both parents. Unfortunately, because Mother has worked to alienate the children from Father, she has succeeded in making Brittany's relationship with Father problematic, and has succeeded in creating a danger that the same problem may develop, at least to some degree, with Dayna. As the Superior Court has reminded, if "a parent who puts his or her own feelings before that of a child will denigrate or berate the other party to the child and make efforts to sabotage the other party's relationship with the child. . . . it is the function of the court to rein in the offending party." *T.B. v. L.R.M.,* 874, A.2d 34, 39 (Pa. Super. 2005). This court determined that, with the intervention ordered, Brittany can and will stand the best chance of achieving stability, and bringing her life under control, in the household maintained by Father and his paramour, Sherri Fritz.

Father and Ms. Fritz impressed the court as stable, rational, and devoted to the four children being raised in their custodial environment (Father's two children

___

260 (1996) ("Aside from the parent-child relationship, the sibling relationship is the most important relationship in a child's development"); William Wessley Patton and Dr. Sara Latz, *Severing Hansel from Gretel: An Analysis of Siblings' Association Rights,* 48 U. Miami L. Rev. 745, 760 (1994) ("studies offer incontrovertible evidence of [sibling] bonds' developmental importance. . . .").

and Ms. Fritz' two children, Devin and Cassie, who were ages seven and five respectively at the time of trial). (R1. at 81, R5. at 27.) Father and Ms. Fritz ensure that the children do their homework, go to bed at an appointed time, engage in appropriate activities, and prioritize their academic work. (R1. at 87-89, R5. at 45-47.) Mother and her paramour do not. Indeed, while Father attempted to focus Brittany on doing adequately well in school, Mother worked at cross purposes. The records showed that Mother and her paramour know very little of the girls' academic work, and have allowed a situation to arise where Brittany receives abysmal grades, is the subject of discipline in school, and shows no signs of progress. (R1. at 89-91, 93-94, R6. at 160-63, 166-67, 182-83.) The evidence established that Mother exhibited a lackadaisical attitude to Brittany's academic and social life. She did not know all of Brittany's grades, she did not know all of Brittany's classes, and she exhibited a tendency to take Brittany's statements at face value. (R6. at 160-63, 166-67, 182-83.) Mother's blasé attitude towards Brittany's lackluster academic performance impairs Brittany's future prospects of success. (R6. at 169-70, 204.)

At every turn in the history of this case, Brittany has been permitted to flout any attempt by Father to set forth rules or parameters for her conduct in the marital, and then in the Father's, household. This has arisen and continued because Mother undercuts Father. Mother has arranged for Brittany to obtain and use a cell phone (apparently a gift from one or both of Mother's parents), and has explicitly or implicitly encouraged Brittany to phone her at any hour on the cell phone upon receiving

any direction or requests or communication from Father with which Brittany chooses to disagree. (R1. at 83, R4. at 128-29, R6. at 110.) In so doing, Mother has continuously sent the message that Brittany can and should demonstrate the maximum of defiance possible to Father at all times. The cell phone procured for Brittany appeared to this court to be an additional favor-currying device, an additional symptom of Mother's election to buy the children's favor when and where possible at the expense of the children's relationship with their father.

Custody exchanges preceding the May 2005 trial have included videotape recording of Father by Mother's paramour, advance self-help equitable distribution by Mother in the form of obtaining Father's personalty from Brittany in bags Brittany brings to and from Father's custodial periods, and tantrums by Brittany at police stations in which Mother acquiesces in Brittany refusing to go with Father for his custody period. (R6. at 68-69, R2. at 29-30, R1. at 36-38, R2. at 70-72, R4. at 37-39.) On more than one occasion, Brittany has placed conditions on Father's exercise of his custody rights, and Mother has allowed this placement of conditions to happen. In short, Brittany has become out of control, with Mother's consent.

This court found that Brittany had become, in effect, the master of the game. She had learned to play Mother and Father off of one another, and to maximize the parties' acrimony. She had learned how to intimidate Father psychologically, and force him and his paramour, in effect, to walk on eggshells in their own home. She

had learned that, by threatening to place conditions on Father's custody unilaterally or threatening that she would depart forthwith for Mother's residence, she could control the pace of events. (R1. at 79-80, 114-16, R2. at 30-31.) She had learned that she could use her influence as Dayna's big sister to begin a process by which Dayna might ultimately end up in the same troubled and alienated position as Brittany. (R1. at 71-73, R2. at 133-34, R3. at 119.)

This court has attempted to put a stop to this process. This court has ordered intervention and counseling, and has, most of all, made clear that the parents, and not the children, will control the custodial environment. Because Father provides the more stable custodial environment, and better serves the children's interests, he is the primary custodian.

Brittany's behavior included obvious anger demonstrated in court. On the witness stand, there were at least two instances in which Brittany's anger was palpable and during which this court noted that she was barely restraining herself from an emotional outburst. This court found that Brittany was, in some sense, the key to this custody case.

Although troubled, Brittany is able to differentiate between right and wrong, and is able to correct her actions when she learns it is in her interest to do so. This was made clear by the uncontroverted testimony that Brittany had behaved very well in the time period during trial. (R4. at 123-24, R5. at 22.) This court concluded that, knowing she would be in Father's primary custody, Brittany would eventually, with professional

help, reconcile herself to a stable and loving environment in which her best interests in advancing herself emotionally and academically could be maximized.

No doubt mindful of the history of this case in motions and PFA court, Brittany testified at the May 2005 trial that Mother had in fact set limits on Brittany's behavior. (R2. at 9-10, 11, 14.) This court expressly declined to credit this testimony. Brittany's offer of this testimony struck this court as contrived, and the testimony seemed to be recent in its creation and controlled in its delivery.

At various points in the case, and most particularly in the PFA matter that was the subject of an earlier opinion issued by this court,[11] Brittany has accused Father of abusing or threatening her. (R2. at 36, 45, 47, 66.) This court has found these allegations, now and in the past, to lack credibility. In his testimony, Dr. Bernstein testified that Brittany would show fear if she had been the subject of any abuse. (R3. at 116.) Dr. Bernstein testified that Brittany in fact shows no fear of Father. *Id.* Dr. Bernstein further testified that Brittany had told him that Father is afraid of Brittany. (R3. at 116-17.) Assessing the testimony in court of Brittany, Father, and others, this court was constrained to agree. This court found that Brittany had succeeded in intimidating Father. In short, Brittany is in charge. By its order, including the parenting plan attached to that

---

11. *Amrhein v. Amrhein,* no. FD 03-1763-003, (C.C.P. Feb. 17, 2004), 152 Pitt. L.J. 245 (Oct. 15, 2004), available at http://www. allegheny-courts.us/opinions/family_adult/(Wecht)% 20Amrhein % 20v%20 Amrhein.pdf.

order, this court hopes to have brought this pathological situation to an end.

Examples abound of Mother's assisting Brittany in flouting the court order and in undermining the children's relationship with Father at every turn. In one instance, Mother told Father in front of the parties' counselor that she would always believe Brittany over Father. (R1. at 134-35, R4. at 141.) In another, Mother and her paramour testified that Mother's paramour assists Brittany with her homework. (R5. at 80-92.) However, Mother's paramour lacked any credibility whatsoever on this point. He could not specify what homework Brittany did, could not identify the subjects on which she works, could not identify the classes in which she is enrolled, and could not substantiate in any way the nature of any homework that Brittany allegedly does in the household maintained by Mother and Mother's paramour. (R5. at 82-92.) By contrast, Father and his paramour testified to an environment in which they foster the children's studies. (R1. at 120-21, R4. at 45-47).

In early March 2005, Mother unilaterally took custody of the children and maintained that custody in the face of this court's week-on/week-off interim order through mid-April, just before the trial of this case. (R2. at 149-50, 156.) In April 2005, Mother also incorrectly informed Perry Traditional Academy (Brittany's high school) that Brittany had a dental appointment, in order to obtain an excused absence so that Brittany could attend the Pittsburgh Pirates' home opener. (R6. at 164-66.) This not only demonstrated dishonesty, but also a

willingness once again to sacrifice the children's academic needs to recreation or entertainment. This Pirates' opener incident was also an example of Mother's practice of rewarding the children for noncompliance with the custody order or Father's directives. The day before the Pirates' opener, Brittany refused to go with Father for Father's appointed custody. (R2. at 162-63.) The very next day, Mother "treated" Brittany to the Pirates' opener. The deceit involved is further manifested by the fact that the tickets apparently had to have been purchased at a prior time. (R2. at 163.)

Further, Mother has discussed the issue of child support payments with the children. (R6. at 56-57.) In 2005, in Mother's presence, Brittany called Father a "deadbeat." (R4. at 158, R6. at 56-57.) Not only did Mother not intervene or instruct Brittany to refrain from such language (R6. at 57), but, in addition, it was clear to this court that the terminology "deadbeat" does not naturally arise from the lexicon of 14- or 15-year-old children, at least not this particular 14- or 15-year-old. Moreover, with Mother's acquiescence, Brittany at age 14 or 15 had a boyfriend of over 18 years in age, who would show up at the marital residence. (R1. at 131-33.)

The evidence also included testimony that a bent spoon and a knife were found under Brittany's bed. (R1. at 133.) Brittany could offer no credible explanation. (R2. at 58, 105-106.) Mother seemed to have no concern about this find. (R6. at 109.) Indeed, another example of Mother's unrealistic faith in Brittany's trustworthiness and virtuousness is Mother's insistence that Father

lied about the spoon and knife under Brittany's bed, notwithstanding the fact that Brittany admitted to these items being found there. (R1. at 134, R6. at 206-208.) When asked whether she would be concerned about the fact that these utensils were found under Brittany's mattress, Mother offered a "yes and no . . . ." response. (R6. at 208.)

In addition to making false and unnecessary reports and calls to the police, Mother, and/or Brittany with Mother's acquiescence, has made or instigated false and unnecessary reports to the Office of Children, Youth and Families (CYF). CYF determined the complaints of abuse or neglect made by Mother or Brittany against Father to be unfounded. (R3. at 134-35, 153.)

On March 6 and 7, 2005, Brittany contrived an objection to Father's desire to check the bag she was bringing to or from Father's house. (R2. at 24-27, R4. at 8-14.) Brittany's real objection was not concerning the bag issue, but rather was to Father's custody. Ultimately, Brittany succeeded in thwarting Father's exercise of his custody rights. (R1. at 42-43.)

This court concluded from wide-ranging and extensive testimonial and documentary evidence, and from palpable witness demeanor and conduct, that Mother hates Father, that this hatred is knife-cut thick, and that this hatred has been passed on diligently and seamlessly to Brittany. This court has strived in its order and in the plan attached thereto, to remedy, at least in some measure, the breach between Father and Brittany, and, not least, to protect Dayna's interest in a good and healthy relationship with both parents.

Mother's credibility at trial was further undermined by her testimony that she was not sure that she sent e-mail messages encouraging Brittany's defiance. (R6. at 147, 150.) However, at the January 7, 2004 PFA hearing, the following e-mail, sent October 31, 2003, was introduced into evidence.

"Good morning Britt:

"Well tonite was fun!!! NOT!!! Just remember keep you and your sister safe. Chris across the street said that if you ever need help, her door is always open and don't hesitate. She knows what is going on. Your dad ? them last week. HA HA!!! Britt I'm proud of you tonite. Pap is proud of you too. You handled yourself better than ever. They r probably saying right now that you r just like ur Mother. Well be proud!!!! At least your pretty and skinny and they r ugly and fat. . . . Also Britt, don't be jealous of what your dad is doing for Dayna. He's doing to her what he did to you. Dayna is your sister and blood is thicker than water. It is going to suck, but suck it up and eat some s***t. I prefer it on a bagel, how bout u? Just watch out for her. Also Britt watch what u do and say. Let him pick the fight not you. Cuz it will just bite you in the end. I can tell ur a Hussar u know how to say f**k. . . .

"Love,

"MOM . . . ." *Amrhein v. Amrhein,* no. FD 03-1763-003, at 7 (C.C.P. Feb. 17, 2004).[12]

---

12. Available at 152 Pitt. L.J. 245 and at http://www.alleghenycourts. us/opinions/family_adult/(Wecht)%20Amrhein%20v%20Amrhein. pdf.

Additionally, an October 28 e-mail was also admitted which read:

"Hey Britt,

"How r u? Hey you and Dayna didn't call and say good-nite? What's up with that? . . . I can't explainin [SIC] how much I want you and Dayna to be with me. This s***t sucks. . . . You and Dayna might not see much of me this week, but believe me right now I am fighting strong. I got my battle clothes on and I am ready to go. . . . Britt things are really going to start to move now, the lines were crossed. I just hope and pray that you and Dayna want that too. . .

"MOM." *Id.* at 8.

There appeared to this court to be a boundary issue in which Mother and paramour to some extent acted as a brother and sister to Brittany more than as a mother and potential stepfather. (R2. at 17, R3. at 18.) Mother showed this court in each and every regard that she is willfully blind to Brittany's failings, and that she has failed to establish a modicum of parental guidance.

Mother exhibited no demonstrable concern about Brittany's rolling out of a website labeling herself "skank ho," and containing vulgar, if oblique, references to virginity and fellatio. (R2. at 20, R6. at 178-79). According to testimony, the website stated, "I don't know how to make cherries pop, but I know how to make bananas cream." (R1. at 95.) Mother could not identify any real mistakes by Brittany, and was unwilling to fault Brittany in any regard. The court found Mother to be an equivocal and cagey witness. Mother

could not identify any errors in judgment shown by Brittany, and finally conceded, only with great reluctance, that the "skank ho" website was perhaps not a terrific idea. (R6. at 183-91.) Mother protested that the website had been "misconstrued." (R6. at 107-108, 189.) As to whether she was concerned about the "skank ho" website and about a provocative photo allegedly contained on that website, Mother testified as follows: "yes and no. . . ." (R6. at 108, 179, 190). This court found Mother's attitude to be unrealistic and troubling. Indeed, the fact that, in response to counsel's questions at trial, Mother testified repeatedly: "yes and no . . . ." was (in this court's opinion) another example of Mother's impaired credibility. (R6. at 108, 125, 127, 152, 154, 179, 190, 208.)

Mother also began the answer to several questions with "in all honesty . . . ." or "honestly . . . ." (R6. at 107, 148, 149, 150, 153, 156, 159, 160, 161, 185, 186, 191, 203, 226.) Taking both the testimony itself and the witness' demeanor into account, as well as the entire record, this court concluded that this preface to several of Mother's answers indicated that Mother doth protest her honesty too much. In stating that she was answering a question "frankly" or "honestly," this court was constrained to conclude that Mother was less than frank and honest in several instances.

This court concluded that Mother, far from reinforcing the other parent, has actively undermined Father. Mother has groomed Brittany into an ally in a perceived war against Father. The court has attempted to stop the war, to take Brittany and Dayna out of the middle, and

to implement a predictable and stable custodial regime.

With respect to Mother's complaint on appeal (issue no. two) that her custody time with Brittany begins on Thursday afternoons, a day when Mother "is required by her employer to work until 8 p.m.", this court emphasizes that Mother testified to her employer's remarkable flexibility in accommodating Mother and Mother's custody schedule. For example, Mother testified that her employer allows her to leave work in the middle of the afternoon to collect one or both children, and then return to work without penalty. (R6. at 91.) Mother emphasized that her employer has been extremely understanding of her in connection with scheduling matters. (R6. at 91-92.) This court specifically provided that Mother would get custody on Thursday afternoon, an additional day, so that Mother could have that supplemental time to allow Brittany to maintain the bond with Mother, and to recognize Brittany's closeness with Mother. The court could have provided that Brittany would go to Mother's custody on Fridays like Dayna, but instead the court allowed Mother an additional full day (with an additional overnight) with Brittany. Mother now appears to complain that this additional custody was unwanted. Mother cannot have it both ways.

With respect to issue no. four in Mother's points on appeal, which challenges this court's provision reducing Mother's custody in the event that either child is directed to attend summer school, this court emphasizes its deep concern about the children's academic success,

with concomitant prospects for success in life. As discussed above in detail, Mother has exhibited a profoundly lackadaisical attitude, and essentially a lack of concern, about the children's academic progress. (R6. at 167-68.) On Mother's watch, Brittany has obtained abysmal grades, and neither Mother nor Brittany appear concerned about this. (R2. at 10.) If, as a result of this performance, Brittany must attend summer school, she will be in Father's custody so that she can focus on the important task of improving her performance so that she has some chance to advance herself in life.

With respect to issue no. five of Mother's points on appeal, which prevents Mother from continuing her demonstrable practice of enrolling Brittany in activities without Father's input, this court specifically notes that Mother insisted on circumventing Father's input by encouraging Brittany to enroll in the softball program in which Mother's paramour coaches despite Father's attempt to condition this continued involvement on some effort by Brittany to do her school work. (R5. at 76, R6. at 198-200.) Further, Mother encouraged Brittany to continue to participate on the cheerleading squad despite Brittany's failure to attend to her school work in any degree. (R1. at 109-11.) This court concluded that both parents should ensure that academic work takes first priority, particularly in view of the track record. Because Mother failed to allow Father to be involved, and misplaced priorities wantonly, this court concluded that it was essential that Father be able to ensure that non-school activities go forward only when academic activities are being given appropriate priority.

With respect to issue no. six of Mother's points on appeal, the court has addressed Mother's involvement, or encouragement or permission of Brittany's involvement, of the police in this matter. The trial record demonstrated that Brittany, with Mother's acquiescence, had continually sought to enmesh the police departments of the City of Pittsburgh and the Township of Ross in this custody dispute. (R1. at 48, 51, 126, R2. at 26, 33, 70.) The court specifically found that this frequent and improper resort to police intervention had placed an unjustifiable burden on valuable public safety resources. The police have important work to do in our communities, and should not be dragged willy-nilly into custody disputes. This court concluded on the record set before it that Mother and Brittany had arrogated to themselves the right to commandeer police officers to help them in their ongoing crusade against Father's attempt to exercise the custody rights provided to him by this court's orders.

With respect to issue no. seven in Mother's points on appeal, this court ordered Mother to pay Daniel Stangrecki, a veteran officer employed by the City of Pittsburgh Police Department, $200 as a fee. This court could well have awarded Officer Stangrecki more than the $200. Indeed, Officer Stangrecki asked for $300. (R4. at 19-22.) This court concluded that Officer Stangrecki would not be entitled to an expert witness fee, inasmuch as Mother subpoenaed him as a fact witness, not as an expert. (R4. at 24.) However, this court awarded $200 to Officer Stangrecki because Mother had chosen to involve him improperly in the parties' custody disputes, had caused her counsel to summon

him to court needlessly, and (in view of the fact that he was off-duty) had caused him to miss opportunities to either work gainfully or rest from his labors. Under the circumstances, $200 was a minor sanction relative to the activity undertaken and the inconvenience caused.

## CONCLUSION

For the foregoing reasons, this court's order of May 16, 2005 should be affirmed.

———————

WECHT, *J.,* September 21, 2006—Plaintiff Christina M. Amrhein (Mother) appeals from this court's May 16, 2005 order granting in part and denying in part the motion for sanctions filed by defendant Michael J. Amrhein (Father).

As discussed in the accompanying opinion separately filed at 1023 WDA 2005 (consolidated herewith), this court entered an order on May 16, 2005 awarding primary custody of the parties' two minor children to Father, and specifying a number of other provisions concerning the terms of custody. By prior order, the issue of sanctions and contempt had been preserved and consolidated for consideration at the May 2005 trial.

The evidence developed on the trial record showed beyond peradventure that Mother was in contempt of this court's September 15, 2004 order. That order had provided, inter alia, that, on an interim basis, the parties would share legal and physical custody on a 50/50 basis, with physical custody rotating weekly. The evidence at trial further showed that Mother unilaterally

had taken custody of the parties' two children on more than one occasion between September 15, 2004 and the trial of this case in May 2005. Most particularly, Mother unilaterally had taken custody of the children for several weeks in March and April of 2005.

As part of his motion for sanctions and contempt, Father requested that Mother "pay back" Father each and every day and week of the custody that Mother had taken from Father during this period. This court denied Father's request, but did grant two weeks additional custody time with the children. This court also required Father to give Mother two weeks advance notice of his selected dates. Further, this court did not award the (a) $650 in counsel fees plus (b) additional counsel fees for time spent on the motion plus (c) monetary sanctions requested by Father (R4. at 151, R6. at 243-44), but instead scaled Father's request back to $750 total, and ordered Mother to pay this within 30 days.

Measured against the record of defiance and misbehavior in this case (as discussed more fully in the accompanying custody opinion at no. 1023 WDA 2005), the award of two weeks custody time and $750 as a sanction for Mother's contempt of this court's order (including her unilateral appropriation of custody in violation of this court's September 15, 2004 order) was a mild remedy overall.

In granting in part and denying in part Father's motion for sanctions, and in concluding that Mother was in contempt of this court's September 15, 2004 order, this court expressly determined that Mother was in willful violation of that order. As our Superior Court

has instructed, trial courts possess inherent authority to enforce their orders. *Goodman v. Goodman,* 383 Pa. Super. 374, 394, 556 A.2d 1379, 1389 (1989). Moreover, in addition to this inherent authority, trial courts possess contempt power to address violation of custody orders pursuant to express statutory authorization. See 23 Pa.C.S. §1346; Pa.R.C.P. 1915.12. It is beyond peradventure that counsel fees may be awarded in connection with contempt proceedings, whether as special damages,[1] or pursuant to the judicial code for "obdurate, vexatious or dilatory conduct."[2]

The contempt aspect of the court's order was coercive in nature, and sought to encourage Mother to comply with this court's custody order, now and in the future. The sanction aspect of this court's order pursuant to the Judicial Code is to convey, in the most direct way possible, that this court disapproves Mother's unilateral decision to take custody of the children on the eve of trial, and that this court believes that Father should not single-handedly bear the costs of paying counsel fees needed to remedy the situation Mother created.

## CONCLUSION

For the foregoing reasons, this court's order of May 16, 2005 should be affirmed.

---

1. *Brocker v. Brocker,* 429 Pa. 513, 241 A.2d 336 (1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 857, 21 L.Ed.2d 773 (1969).
2. 42 Pa.C.S. §2503(7); *Bonds v. Bonds,* 455 Pa. Super. 610, 689 A.2d 275 (1997); *M.C. v. R.W.,* 398 Pa. Super. 183, 580 A.2d 1124 (1990).