J-A02008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| J.F. | |
| Appellant | No. 1571 MDA 2015 |

Appeal from the Order Entered August 13, 2015
In the Court of Common Pleas of Berks County
Civil Division at No: 10-15544

BEFORE:  PANELLA, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 21, 2016**

Appellant J.F. ("Father") appeals from the August 13, 2015 order of the Court of Common Pleas of Berks County ("trial court"), denying Father's petition for shared custody and granting J.F. ("Mother") primary physical custody of the parties' minor twin daughters, R.F. and A.F. ("Children"). Upon review, we affirm.

On September 9, 2011, the trial court entered a custody order, incorporating an agreement by the parties pursuant to which Mother was awarded, *inter alia*, primary physical custody and Father partial physical custody.  On August 1, 2013, Father filed a petition to modify custody, seeking shared physical custody of Children.  On September 17, 2013,

_____

[*] Former Justice specially assigned to the Superior Court.

Mother filed an answer to Father's modification petition, seeking an increase in her and a reduction in Father's custodial time with Children. The trial court held a three-day custody trial, at which both parties testified and presented the testimony of various witnesses. Following trial, the trial court issued a decision and order, denying Father's petition for shared physical custody and increasing Mother's custodial time with Children. In so doing, the trial court rendered the following factual findings:

1. [Mother] is an adult individual currently residing . . . [in] Douglasville, Berks County Pennsylvania 19518.

2. [Father] is an adult individual currently residing . . . [in] Royersford, Montgomery County, Pennsylvania, 19468.

3. The parties are the natural parents of two minor twin daughters, R.F. and A.F., born April 21, 2009 . . . .

4. The parties were formerly husband and wife, having been married on July 5, 1997 in Berks County, Pennsylvania. The parties separated in the summer of 2010 and a [d]ivorce [d]ecree was signed on February 17, 2012.

5. Since the time of separation, Mother has been the primary custodian of the Minor Children.

6. Following separation, Mother and [Children] moved to [m]aternal [g]randparents home . . . [in] Douglasville, Pennsylvania, which was only several blocks from the marital home.

7. Maternal grandparents have now relocated to Hazelton and Mother rents the home from her parents.

8. Father remained in the marital home following separation and saw [Children] on a regular basis until he moved in with his then girlfriend now wife [A.F.] in Montgomery County.

9. The distance between the parties [sic] home is approximately 35-40 minutes.

10. [A.F.] has three children: L.M. (age 15), A.M. (age 13) and T.M. (age 9). She recently obtained a 50/50 custody agreement with her ex-husband.

11. Both parties are college graduates, both are teachers and both hold Master's Degrees and additional credits.

12. Mother is employed at Owen J. Roberts School District where she teaches Fourth Grade.

13. Mother has been employed by the Owen J. School District for approximately twenty (20) years and her work schedule is Monday through Friday during the school year from approximately 7:50 a.m. to 3:15 p.m. She has most of the same holidays during the school year as [Children] and does not work during the summer.

14. Father has been employed as a special education teacher for the Spring-Ford Area School District for approximately eleven (11) years and his work schedule is similar to [M]others [sic], although his work day begins at 7:15 a.m.

15. Father's wife, [A.F.], is also employed by the Spring-Ford Area School District.

16. Mother resides within the Daniel Boone School District.

17. Father resides within the Spring-Ford Area School District.

18. [Children] are entering first grade and attending the Daniel Boone School District.

19. [Children] attend St. Paul's Daycare both prior to and after school. St. Paul's is minutes from [M]other's home and provides transportation to and from Daniel Boone School District.

20. Mother grew up in the Daniel Boone School District and after both parties attended college at Slippery Rock University, Father agreed to move to the Daniel Boone School District where they built their marital home.

21. The Daniel Boone School District is a good school district providing quality education.

22. Neither party, including Father's wife, has a criminal record.

23. On December 8, 2010, following separation, Mother filed a Custody Complaint seeking primary custody of the minor children.

24. On March 2, 2011, [the trial court] entered a Custody Evaluation Order, whereby Dr. Peter Thomas was directed to perform a custody evaluation of the [p]arties. Dr. Thomas completed the report, which is part of the record, dated March 6, 2011. This evaluation recommended Mother have primary physical custody.

25.   On September 8, 2011, the parties, by agreement, entered into a Custody Order which the parties currently follow, whereby the parties share legal custody and Mother has primary physical custody.  The order [sic] Custody Order provides, *inter alia*, that the parties share custody of [Children] during the school year on a four week rotating schedule pursuant to the agreement as follows:

<u>During the school year:</u>

<u>Week one:</u>  Mother has custody of [Children] from Sunday at 6:30 p.m. until Wednesday morning when she will deliver [Children] to daycare.  Father has custody from Wednesday, when he picks [Children] up from daycare until Friday morning when he delivers [them] to daycare. <u>Week two:</u>  Father has [Children] from Wednesday after daycare until Sunday at 6:30 p.m.  Mother has [them] from Sunday at 6:30 p.m. until the following Wednesday morning when she delivers [Children] to daycare.  <u>Week three:</u>  Father has [Children] after daycare until Friday morning when he delivers [them] to daycare.  Mother has [Children] from Friday after daycare until the following Thursday morning, when [s]he delivers [Children] to daycare. <u>Week four:</u>  Father has [Children] from Thursday after daycare until Sunday at 6:30 p.m.

<u>During the summer:</u>

The parties share custody of [Children] during the summer, which spans from June 10 until August 25 on a two[-]week rotating schedule pursuant to the agreement as follows: Week one:  Father has [Children] Sunday at 6:30 p.m. until Wednesday at 6:30 p.m. and again on Friday at 6:30 p.m. until Sunday at 6:30 p.m.  Mother has [Children] from Wednesday at 6:30 p.m. until Friday at 6:30 p.m.  Week two:  Mother has [Children] from Sunday at 6:30 p.m. until Wednesday at 6:30 p.m. and again on Friday at 6:30 p.m.  In addition, the Custody Order directed that the custodial parent shall make reasonable efforts to facilitate phone contact between the non-custodial parent and [Children] between 7:40 p.m and 8:00 p.m. each evening.

26. The Current Custody Order was entered prior to [Children] being school age and prior to [Father] relocating to Montgomery County.

27. On August 1, 2013, weeks after his marriage, Father filed a Petition to Modify Custody, seeking equal time with the Children.

28. On September 17, 2013, Mother filed an Answer to Father's Petition to Modify Custody, requesting an increase in her time and a reduction in Father's custodial time with [Children].

29. On September 27, 2013, the [p]arties were ordered to participate in an Updated Custody Evaluation with Dr. Thomas in consideration of Father's remarriage and the addition of Father's step-children into [Children's] lives. Father objected to his Order and petitioned the Court for the removal of Dr. Thomas, a motion that was denied. Dr. Thomas completed the report, which is part of the record and is dated February 12, 2014. Dr. Thomas recommends Mother continue to have primary physical custody.

30. In 2014, Father filed for Special Relief, seeking to have [Children] attend kindergarten in the Spring-Ford School District despite the fact that Mother had primary custody and the parties had agreed to raise their children in the Daniel Boone School District where [M]mother was raised and is living. This Relief was denied by th[e trial court].

31. On January 6, 2015, th[e trial court] appointed Claire Monfaro, M.A.-L.P.C. of Berkshire Psychiatric to perform counseling for [Children].

32. Ms. Monfaro has recommended that counseling of [Children] continue.

33. Ms. Monfaro testified to lack of communication and co-parenting.

34. On March 2, 2015, per Father's request, th[e trial court] appointed Lauren Marks, Esq. Guardian ad Litem ("GAL"), with Father paying 100% of the costs.

35. The GAL testified that Father is rigid and refuses to accept opinions which do not match his own.

36. The GAL found [Children] have been influenced by Father in their statements regarding equal time with Mother.

37. The GAL did an extensive report and investigation into this case and recommends Mother have primary physical custody.

38. Mother resides in a nice home in an area where she grew up and has numerous neighbors and friends. [Children] have their own room at [M]other's house.

39. Father and his wife reside in a nice home in Montgomery County in a nice neighborhood. His wife's three minor children are at the home 50 percent of the time. [Children] share a bedroom with each other at Father's home.

40. Since birth, [Children] have attending [sic] Reading Pediatrics in Wyomissing, Berks County.

41. Father unilaterally attempted to have a second Pediatrician for [Children] in Montgomery County, Allstar Pediatrics.

42. Allstar Pediatrics informed Father they could only be used in case of emergencies.

43. Father has obsessed [sic] with Mother's whereabouts and what is going on in her home by following Mother's friends on social media sites, enlisting the help of a neighbor to sneak into Mother's home to take pictures and by speaking to [Children].

44. Father has obsessed over minor child's [sic] R.F.'s diagnosis of [f]ructose [i]ntolerance by seeking the opinion of Reading Pediatrics, doctors at Children's Hospital of Philadelphia, doctors at Dupont Medical and a dietician. All agreed that [R.F.'s] fructose diet need[s] to me [sic] monitored with a good diet.

45. Father has allowed his wife [A.F.] to overstep her bounds as a step-parent by allowing her to attend a [d]octor's visit at DuPont without the knowledge of Mother and without the knowledge of the [d]octors who have [A.F.] listed as mother in their reports.

46. [R.F.]. rarely complains of stomach issue [sic] when in the care of Mother but does complain when in the care of Father.

47. Father is oblivious [of] his controlling nature as is evident of the overabundance of documents, many of which were not in his favor, he submitted to the GAL and various experts in his case.

48. If mother is in need of babysitting for [Children] she uses her parents.

49. [Children] have a loving, bonded relationship with their maternal grandparents.

50. Father does not have a close relationship with his family as is evident by his sister having to contact Mother after the divorce so that she could see and spend time with [Children].

51. Mother actively participates with [Children] in a variety of school and community functions.

52. Father actively participates with [Children] more at home than the community.

53. During the parties [sic] marriage they attended UCC church, however Father decided to have [Children] baptized [C]atholic.

54. Father has obsessed over a relationship Mother has had off and on again with [M.K.], from South Carolina. Father insists Mother is going to relocate.

55. Mother has no intentions of relocating. Mother plans on maximizing her Pennsylvania teacher pension for retirement purposes.

56. Father and Mother are not able to effectively co-parent.

Trial Court Opinion, 8/13/15, at 1-7. Based on the foregoing findings, the trial court concluded that the custody factors set forth in 23 Pa.C.S.A. § 5328 weighed in favor of awarding Mother primary physical custody. Section 5328 factors to be considered are as follows.

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
>
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
>
> (11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[1]  The trial court provided a detailed discussion of each Section 5328 factor.[2]  With respect to the first factor, the trial court determined that Mother "[was] more likely to encourage and permit frequent and continuing contract between [Children] and Father." *Id.* at 9.  The second factor, the trial court determined, favored Mother even though the court did not believe "that [Children] [were] at risk of abuse by either Mother or Father." *Id.* 10.  The trial court determined that the third factor favored Mother in part because Father spent the majority of his time with Children at home when they were not at their extra-curricular activities. *Id.*

_____

[1] Effective January 1, 2014, the statute was amended to include an additional factor at 23 Pa.C.S.A. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).  Because Father's petition to modify was filed prior to the effective date of the subsection, the subsection does not apply to the present case.  *See* § 6 of Act of December 18, 2013, P.L. 1167, No. 107, effective 1/1/14.

[2] In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation of the Section 5328 factors; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. *A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citation and quotation marks omitted).

at 10-12. The trial court further determined that the fourth factor also favored Mother because Mother would provide stability and continuity in Children's education, family life and community life. *Id.* at 12-13. The trial court determined that the fifth factor, relating to the availability of extended family, also favored Mother. *Id.* at 15. The sixth and seventh factors favored neither parent. *Id.* at 15-16. The eighth factor favored Mother in part because Father engaged in "borderline stalking" and questioned Children about Mother's personal affairs. *Id.* at 17-18. The ninth factor likewise favored Mother because she, compared to Father, was more nurturing toward Children and Children expressed closeness to Mother. *Id.* at 18. The trial court determined that the tenth factor favored Mother in part because Mother socialized Children "on a regular basis with activities and friends outside of the home." *Id.* at 20. The eleventh and twelfth factors favored Father as he chose to relocate to Montgomery County. *Id.* at 20-21. Factors thirteen and fourteen did not favor either party. *Id.* at 21-22. The trial court determined that the fifteenth factor favored Mother in part because of Father's "controlling personality." *Id.* at 23. The final factor did not favor either parent. *Id.* at 24.

Father timely appealed to this Court. Following Father's filing of his Pa.R.A.P. 1925 statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion largely incorporating its August 13, 2015 decision. Nonetheless, in its Rule 1925(a) opinion, the trial court addressed Father's contention that its August 13, 2015 order failed to consider "the

possible effect on Children" of the new custody arrangement and deprived Children of "Father's care for extended periods during the school week." Trial Court's Rule 1925(a) Opinion, 10/6/15 at ¶ 5. Disagreeing with Father, the trial court noted that the Section 5328 factors did not require it to address this argument.[3] *Id.* The trial court, throughout its Rule 1925(a) opinion, noted that it is decision was guided by the best interest of Children. The trial court next addressed Father's contention that it awarded less custodial time to Father than recommended by the experts, Dr. Thomas and the GAL. The trial court noted that it considered the experts' recommendation, but because it heard testimony from witnesses not interviewed by the experts, it decided to award Father less custodial time "to promote stability and consistency during the school week."[4] *Id.* at ¶ 4(a). Father next argued that the trial court's finding of fact number 9—the

_____

[3] We observe that Father's contention is adequately addressed by the custody factors set forth in Section 5328. It is worth noting that whenever a trial court weighs the custody factors, children often are bound to be deprived of the care of one parent.

[4] Although a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and, if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record. *Nomland v. Nomland*, 813 A.2d 850, 854 (Pa. Super. 2002) (citations omitted). Therefore, it is not the function of this Court to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party. *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005).

distance between the parties' home is approximately 35-40 minutes—was not supported by the record. The trial court concluded that, even though its time estimate was off by about 10 minutes, the commute from Father's house was still significant.[5] *Id.* at ¶ 4(c). The trial court lastly addressed Father's contention that its August 13, 2015 order "increases the number of parent-to-parent custody exchanges, despite the trial court's finding that fewer custody exchanges would be appropriate to minimize" interaction between Father and Mother. *Id.* at ¶ 4(d). In rejecting this argument, the trial court noted that the August 13, 2015 custody order was in the best interest of Children and that "[e]xchanges between Mother and Father are necessary" and "only incidental to the custody arrangement's purpose." *Id.*

On appeal,[6] Father repeats the foregoing issues for our review, reproduced here verbatim:

---

[5] As Mother aptly notes, "Father's argument is pure inconsequential nitpicking." Mother's Brief at 49. The precise time between the parties' home is immaterial, so long as the trial court's finding that the commute was significant has support in the record. Here, the parties agree that the commute between the parties' homes is 20 to 25 minutes. Father's Brief at 64; Mother's Brief at 49.

[6] In reviewing a child custody order,

> [O]ur our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its

*(Footnote Continued Next Page)*

- 11 -

1. Whether the trial court erred and/or abused its discretion in failing to address the fact that [Children] will now be deprived of Father's care for extended periods during the school week and failed to discuss the possible effect on [Children] of the proposed transfer of custody?

2. Whether the trial court's analysis of the Section 5328 factors is supported by the record?[7]

3. Whether the trial court's decision to award Father less custodial time than recommended by the custody evaluator, Dr. Thomas, less time than recommended by [GAL], Lauren Marks, Esq., and less time than Father had spent with [Children] under the parties' existing custodial arrangements [sic] over the past four (4) years is supported by the record?

4. Whether the trial court erred in repeatedly misstating the amount of travel time for [Children] in traveling between the parties' homes, school, and daycare?

5. Whether the trial court erred in entering an [o]rder that significantly increases the number of parent-to-parent custody exchanges, despite the [c]ourt's finding that fewer custody exchanges would be appropriate to minimize the frequency of interaction between Mother and Father[?]

Father's Brief at 8-9.[8,9]

_____

*(Footnote Continued)* ——————————

factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***V.B. v. J.E.B.***, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted). "When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted); *see **Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) ("The primary concern in any custody case is the best interest of the child. The best-interest standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being.") (citation omitted).

[7] Father abandons his challenge to the sixteenth factor on appeal. ***See*** Father's Brief at 54.

[8] In his second argument, Father essentially advances his version of the facts and invites us to accept the same. We, however, are obliged to reject

*(Footnote Continued Next Page)*

After careful review of the parties' briefs, the record on appeal, and the relevant case law, we conclude that the trial court's August 13, 2015 decision and its Rule 1925(a) opinion, both authored by the Honorable M. Theresa Johnson, cogently dispose of Father's issues on appeal. **See** Trial Court Opinion, 8/13/15, at 8-24; Trial Court's Rule 1925(a) Opinion, 10/6/15. We, therefore, affirm the trial court's August 13, 2015 order. We direct that a copy of the trial court's August 13, 2015 decision and its October 6, 2015 Rule 1925(a) opinion be attached to any future filings in this case.

Order affirmed.

Judge Panella joins the memorandum.

Justice Fitzgerald notes his dissent.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

the invitation as we are bound by the trial court's findings. **Johnson v. Lewis**, 870 A.2d 368, 372 (Pa. Super. 2005) ("The fact-finder is free to believe all, part, or none of the evidence, and this Court will not disturb the trial court's credibility determinations.").

[9] With the exception of finding of fact number 9, as alluded to in Father's fourth argument, Father fails to challenge the trial court's factual findings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/21/2016</u>

J██ F█████████,                   : IN THE COURT OF COMMON PLEAS
    PLAINTIFF                     : OF BERKS COUNTY, PENNSYLVANIA
                                  :
                                  :
    v.                            :
                                  : CIVIL ACTION – LAW
                                  : CHILD CUSTODY
                                  : NO. 10-15544
J██ F█████████,                   : ASSIGNED TO: M. THERESA JOHNSON, J.
DEFENDANT

**RULE 1925(a)(2)(ii) Opinion**                           **October 6, 2015**

On July 27, 28 and 30, 2015, a custody bench trial was held before this Court to determine the parties' custody of their minor children, R.F. and A.F. On August 13, 2015 the Court entered a Decision and Order after consideration of the testimony of the parties, testimony of both expert and fact witnesses, as well as the parties' respective exhibits. The Decision and Order is attached and is specifically incorporated herein. [August 13, 2015 Decision and Order, Exhibit "A"]. On September 11, 2015, Defendant J██ F█████ timely appealed this Court's August 13, 2015 Decision and Order. The appeal was designated as a Children's Fast Track Appeal. On the same day, Defendant filed his Concise Statement of Errors Complained of on Appeal, which provides:

1. The Trial Court erred and/or abused its discretion in analyzing the factors to be considered in a custody matter pursuant to 23 Pa.C.S.A. §5328, as the Court's analysis (a) is not supported by the record, (b) is based on only portions of the record; and/or (c) is based on predictions/ speculation about what may occur in the future.
2. The Trial Court erred and/or abused its discretion in limiting the ability of each party to call witnesses at trial and/or limiting the evidence to be submitted by each party at trial ruling on the relevance of said evidence, and without making a finding which would otherwise support exclusion of the evidence.
3. The Trial Court erred and/or abused its discretion in summarily rejecting the expert testimony of Dr. Shanken-Kaye.
4. The Trial Court erred and/or abused its discretion in that its Decision and Order is not supported by the record and/or is based only on portions of the record, including, but not limited to, the following:

91

a. The Trial court awarded Father less custodial time then recommended by the custody evaluator, Dr. Thomas, less time than recommended by the Guardian Ad Litem, Lauren Marks, Esq., and less time than Father had spent with the children under the parties' existing custodial arrangements over the past four (4) years.

b. The Trial Court erred and/or abused its discretion in reviewing evidence, during the trial, which was not admitted into the record.

c. The Trial Court repeatedly misstated the amount of travel time for the children in traveling between the parties' homes, school, and daycare, and classified Father's move from Douglasville to Royersford as a "relocation" without addressing the statutory definition of relocation nor the statutory factors which must be considered in a relocation case.

d. Despite the Court's finding that fewer custody exchanges would be appropriate to minimize the frequency of interaction between Mother and Father, the Court's Custody Order significantly increases the number of parent-to-parent custody exchanges (as compared to the prior custodial arrangement).

5. The Trial Court erred and/or abused its discretion in failing to address the fact that the Children will now be deprived of Father's care for extended periods during the school week and failed to discuss the possible effect on the Children of the proposed transfer of custody.

[Defendant/ Appellant's Concise Statement of Errors Complained of on Appeal].

To the extent that the errors complained of in Appellant's Concise Statement are not covered by the Decision and Order, the Court addresses Appellant's averments in turn.

1. The Trial Court erred and/or abused its discretion in analyzing the factors to be considered in a custody matter pursuant to 23 Pa.C.S.A. §5328, as the Court's analysis (a) is not supported by the record, (b) is based on only portions of the record; and/or (c) is based on predictions/ speculation about what may occur in the future.

Initially, the Court notes that on August 25, 2015, Father's attorney who represented him at trial withdrew her appearance. On the same day, Father's current attorney entered her appearance. Father's appellant attorney, who drafted and signed Father's Concise Statement, was not present during the July 27, 28 and 30, 2015 trial. In addition, Father's Concise Statement, filed September 11, 2015, was drafted without the benefit of a review of the trial transcript as the Notice of Lodging Transcript of Record on Appeal was filed on September 24

2015. Thus, respectfully, Father's appellant attorney drafted the Concise Statement without observing the trial or reading the trial transcript.

"The Custody Act requires only that the trial court articulate the reasons for its custody decision in open court or in a written opinion or order taking into consideration the enumerated factors." M.J.M. v. M.L.G., 63 A.3d 331, 336 (Pa. Super. 2013) *citing* 23 Pa.C.S.A. §§ 5323(d), 5328(a). In reaching a custody decision, the best interest of the children in paramount. J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa. Super. 2011).

Here, the Court, in writing its twenty-seven page Decision and Order, took into consideration the entire record as well as the sixteen enumerated actors in making its custody determination. The Court reached its decision, holding paramount the best interest of the minor children A.F. and R.F. In addition, the Court did not base its decision on future predictions or speculation. Rather, the Court based its opinion on what is in the best interest of the children.

2. The Trial Court erred and/or abused its discretion in limiting the ability of each party to call witnesses at trial and/or limiting the evidence to be submitted by each party at trial ruling on the relevance of said evidence, and without making a finding which would otherwise support exclusion of the evidence.

A three day trial was held wherein both parties were provided a full opportunity to present their respective cases. In addition, it is well established that the "court may exclude relevant evidence if its probative value is outweighed by a danger of. . . undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E., Rule 403. "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." Com. v. Drumheller, 808 A.2d 893, 904 (Pa. 2002).

Here, Father does not point to a specific instance, either prior to or during the trial, where this Court improperly limited the witnesses or evidence he sought to introduce. Provided that

Father does identify a specific instance where this Court improperly limited evidence, this Court, as the gatekeeper of evidence, did not abuse its discretion in doing so.

3. The Trial Court erred and/or abused its discretion in summarily rejecting the expert testimony of Dr. Shanken-Kaye.

"[W]hen expert evaluation is contradicted. . .the [trial court] abuses its fact finding discretion if it totally discounts expert evaluation." King v. King, 889 A.2d 630, 632 (Pa. Super. 2005) *quoting* Nomland v. Nomland, 813 A.2d 580, 854 (Pa. Super. 2002). "While a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record." M.A.T. v. G.S.T., 989 A.2d 11, 20 (Pa. Super 2010). Here, Dr. Shanken-Kaye's testimony and report were contradicted by Dr. Thomas' testimony and expert reports as well as by Claire Monfaro's evaluation and testimony.

A trial court is "under no obligation to delegate its decision making authority to [an expert]." M.A.T. v. G.S.T., 989 A.2d at 19. In reaching a custody decision, the Court considered Dr. Shanken-Kaye's testimony as well as his expert report. In doing so, the Court found significant that Dr. Shanken-Kaye did not conduct any interview of the participants himself. Rather, he relied on Dr. Thomas' notes and report. As stated provided in the Decision and Order, Dr. Shanken-Kaye's major criticisms of Dr. Thomas' reports were: 1. Dr. Thomas did not specifically address each on the of sixteen factors in 23 Pa.C.S.A. §5328; and 2. Dr. Thomas did not commit enough hours when he conducted interviews and observations of the parties and children to produce a competent recommendation. However, as stated in the Decision and Order, 23 Pa.C.S.A. § 5328 applies to the courts alone and does not require a custody evaluator such as Dr. Thomas to address each or any of the sixteen factors. Additionally, Dr. Thomas

testified that he in fact invested more hours than required by the rules and ethics of psychiatry. In sum, the Court did not summarily reject Dr. Shanken-Kaye's testimony. Rather, the court considered his testimony and disagreed.

4. (a) <u>The Trial court awarded Father less custodial time then recommended by the custody evaluator, Dr. Thomas, less time than recommended by the Guardian Ad Litem, Lauren Marks, Esq., and less time than Father had spent with the children under the parties' existing custodial arrangements over the past four (4) years.</u>

Dr. Thomas interviewed the parties of this custody action the minor children subject to this custody action, A.F. and R.F., L███, A███ and T██r M██, Father's step-children, and maternal grandparents, H██ and G██S████r. In addition, Dr. Thomas observed joint sessions between Mother and Father, individually, and their interaction and dynamic with A.F. and R.F. Lauren Marks, Esq., *Guardian Ad Litem* (hereinafter, the "GAL"), met with the parties and minor children R.F. and A.F. She conducted a home assessment of Father's home wherein she met Father's wife, A██F█████ and her children L██, A███ and T██r M██. At trial, the Court had the opportunity to observe several witnesses that neither Dr. Thomas nor the GAL met with or interviewed in preparation of their respective reports. The testimony of the witnesses at trial influenced the Court to enter a custody order that differs from the recommendations of Dr. Thomas and the GAL.

Both Dr. Thomas and the GAL recommended that the children have one overnight per week with Father during the school year. In an effort to promote stability and consistency during the school week, the Court instead ordered that the children visit with Father every Wednesday from 4:30 p.m. to 6:30 p.m. When the children are with Father, their bedtime is 7:00 p.m., much earlier than their bedtime when they are in Mother's custody. Because of differing bedtimes, the Court believes that awarding Father one overnight per week during the school year would disrupt the children's sleeping schedule and bedtime routine.

In addition, the Court found concerning that fact that "[u]nbeknownst to Mother until this past April, Father was getting a second copy of the homework and making the children do the homework twice. . . While homework in kindergarten may be minor, the Court is concerned that as the girls move forward in their academics years he will continue the same pattern." [August 13, 2015 Decision and Order, pg. 11]. Again in the interest of stability and routine in the children's school week routine, the Court believes that it is in the best interest of the children for Father to have custody every Wednesday from 4:30 p.m. to 6:30 p.m. rather than one overnight per week.

4. (b) The Trial Court erred and/or abused its discretion in reviewing evidence, during the trial, which was not admitted into the record.

The Court considered only the evidence admitted into the record in making its custody determination.

4. (c) The Trial Court repeatedly misstated the amount of travel time for the children in traveling between the parties' homes, school, and daycare, and classified Father's move from Douglasville to Royersford as a "relocation" without addressing the statutory definition of relocation nor the statutory factors which must be considered in a relocation case.

In the Decision and Order, the Court stated the travel time between Father's house and Mother's house was between thirty five and forty minutes. A quick Google Maps search shows that the estimated time between the residences is between thirty one and thirty seven minutes without taking into account traffic. In the Decision and Order, the Court stated that the travel time between Father's house and the children's daycare, located at 548 Old Swede Rd., Douglasville was thirty to forty minutes. A Google Maps search shows that the estimated travel time, depending on traffic, is 23 minutes. In any event, despite this discrepancy, the Court finds that the commute from Father's house to the daycare is significant and that factor eleven weighs in favor of Mother.

Further, the Court simply used the term "relocation" to describe Father's move to his Royersford home. Relocation, as defined in 23 Pa.C.S.A.§ 5337 was not at issue at trial. Thus, the Court did not address the relocation statute or the factors therein.

4. (d) Despite the Court's finding that fewer custody exchanges would be appropriate to minimize the frequency of interaction between Mother and Father, the Court's Custody Order significantly increases the number of parent-to-parent custody exchanges (as compared to the prior custodial arrangement).

The Court believes that the parties' custody schedule as ordered in the Decision and Order is in the best interest of the minor children A.F. and R.F. Exchanges between Mother and Father are necessary and the fact that the Decision and Order increased the number of exchanges is only incidental to the custody arrangement's purpose-it is best for the children.

5. The Trial Court erred and/or abused its discretion in failing to address the fact that the Children will now be deprived of Father's care for extended periods during the school week and failed to discuss the possible effect on the Children of the proposed transfer of custody.

23 Pa.C.S.A. § 5328 requires that the court issue an order and supporting opinions specifically addressing the sixteen factors contained therein. A trial court is required to address all sixteen factors of § 5328, and the failure to do so amounts to an error of law. J.R.M. v. J.E.A., 33 A.3d 647, 652 (Pa. Super. 2011). However, none of the sixteen factors require a trial court to "address the fact that the Children will now be deprived of Father's care for extended periods during the school week." The Court entered its Decision and Order in consideration of the sixteen factors and what is in the best interest of the minor children.

WHEREFORE the Court would respectfully request that the Superior Court AFFIRM the August 13, 2015 Decision and Order and DENY appellant's appeal.

BY THE COURT:

_M. Theresa Johnson_ (signature)

M. Theresa Johnson, J.

**Certified Distribution**

☒ Prothonotary (original)

☒ Computer

☒ Judge

☒ Attorney for the Plaintiff: Randy A. Rabenold, Esq.

☐ Plaintiff:

☒ Attorney for the Defendant: Christina M. DeMatteo, Esq.

☐ Defendant:

J███ F█████████,
PLAINTIFF

v.

J███ F███████,
DEFENDANT

: IN THE COURT OF COMMON PLEAS
: OF BERKS COUNTY, PENNSYLVANIA
:
: NO. 10-15544
:
: CIVIL ACTION – LAW
: CHILD CUSTODY
:
: ASSIGNED TO: M. THERESA JOHNSON, J.

Randy A. Rabenold, Esquire, attorney for Plaintiff, Julie Feldmann

Tina M. Boyd, Esquire, attorney for Defendant, John Feldmann

**DECISION AND ORDER, M. THERESA JOHNSON, JUDGE**     August 13, 2015

    The matter before this Court is the Petition of Defendant, J██ F█████ (hereinafter "Father"), for a Modification of a Custody Order entered by agreement of the parties on September 8, 2011. Trial was held on July 27, 28 and 30, 2015. The Court enters the following Findings of Fact:

## I.    FINDINGS OF FACT

1. Plaintiff, J██ F██████, (hereinafter "Mother"), is an adult individual currently residing at█ Yellowhouse Drive, Douglassville, Berks County Pennsylvania 19518.

2. Defendant, J██ F█████. ("Father"), is an adult individual currently residing at ██ Crosshill Road, Royersford, Montgomery County, Pennsylvania 19468.

3. The parties are the natural parents of two minor twin daughters, R.F. and A.F., born April 21, 2009, (hereinafter "Minor Children").

4. The parties were formerly husband and wife, having been married on July 5, 1997 in Berks County, Pennsylvania. The parties separated in the summer of 2010 and a Divorce Decree was signed on February 17, 2012.

1

5. Since the time of separation, Mother has been the primary custodian of the Minor children.

6. Following separation, Mother and the Minor Children moved to Maternal Grandparents home at 5 Yellowhouse Drive Douglassville, Pennsylvania, which was only several blocks from the marital home.

7. Maternal grandparents have now relocated to Hazelton and Mother rents the home from her parents.

8. Father remained in the marital home following separation and saw the minor children on a regular basis until he moved in with his then girlfriend now wife A███ F██████ in Montgomery County.

9. The distance between the parties home is approximately 35-40 minutes.

10. A███ F██████ has three children: L.M. (age 15), A.M. (age 13) and T.M. (age 9). She recently obtained a 50/50 custody agreement with her ex-husband.

11. Both parties are college graduates, both are teachers and both hold Master's Degrees and additional credits.

12. Mother is employed at Qwen J. Roberts School District where she teaches Fourth Grade.

13. Mother has been employed by the Owen J. School District for approximately twenty (20) years and her work schedule is Monday through Friday during the school year from approximately 7:50 a.m. to 3:15 p.m. She has most of the same holidays during the school year as the minor children and does not work during the summer.

14. Father has been employed as a special education teacher for the Spring-Ford Area School District for approximately eleven (11) years and his work schedule is similar to mothers, although his work day begins at 7:15 a.m.

15. Father's wife, A███ F██████, is also employed by the Spring-Ford Area School District.

2

16. Mother resides within the Daniel Boone School District.

17. Father resides within the Spring-Ford Area School District.

18. The Minor Children are entering first grade and attending the Daniel Boone School District.

19. The minor children attend St. Paul's Daycare both prior to and after school. St. Paul's is minutes from mother's home and provides transportation to and from Daniel Boone School District.

20. Mother grew up in the Daniel Boone School District and after both parties attended college at Slippery Rock University, Father agreed to move to the Daniel Boone School District where they built their marital home.

21. The Daniel Boone School District is a good school district providing quality education.

22. Neither party, including Father's wife, has a criminal record.

23. On December 8, 2010, following separation, Mother filed a Custody Complaint seeking primary custody of the minor children.

24. On March 2, 2011, this Court entered a Custody Evaluation Order, whereby Dr. Peter Thomas was directed to perform a custody evaluation of the Parties. Dr. Thomas completed the report, which is part of the record, dated March 16, 2011. This evaluation recommended Mother have primary physical custody.

25. On September 8, 2011, the parties, by agreement, entered into a Custody Order which the parties currently follow, whereby the parties share legal custody and Mother has primary physical custody. The order Custody Order provides, *inter alia*, that the parties share custody of the children during the school year on a four week rotating schedule pursuant to the agreement as follows:

3

## During the school year:

Week one: Mother has custody of the children from Sunday at 6:30 p.m. until Wednesday morning when she will deliver the children to daycare. Father has custody from Wednesday, when he picks the children up from day care until Friday morning when he delivers the children to daycare. Week two: Father has the children from Wednesday after daycare until Sunday at 6:30 p.m. Mother has the twins from Sunday at 6:30 p.m. until the following Wednesday morning when she delivers the children to daycare. Week three: Father has the children after daycare until Friday morning when he delivers the children to daycare. Mother has the children from Friday after daycare until the following Thursday morning, when he delivers the children to daycare. Week four: Father has the children from Thursday after daycare until Sunday at 6:30 p.m.

## During the Summer:

The parties share custody of the children during the summer, which spans from June 10 until August 25 on a two week rotating schedule pursuant to the agreement as follows: Week one: Father has the children Sunday at 6:30 p.m. until Wednesday at 6:30 p.m. and again on Friday at 6:30 p.m. until Sunday at 6:30 p.m. Mother has the children from Wednesday at 6:30 p.m. until Friday at 6:30 p.m. Week two: Mother has the children from Sunday at 6:30 p.m. until Wednesday at 6:30 p.m. and again on Friday at 6:30 p.m. until Sunday at 6:30 p.m. Father has the children form Wednesday at 6:30 p.m. until Friday at 6:30 p.m. In addition, the Custody Order directed that the custodial parent shall make reasonable efforts to facilitate phone contact between the non-custodial parent and the children between 7:40 p.m. and 8:00 p.m. each evening.

4

26. The Current Custody Order was entered prior to the children being school age and prior Mr. Feldman relocating to Montgomery County.

27. On August 1, 2013, weeks after his marriage, Father filed a Petition to Modify Custody, seeking equal time with the Children.

28. On September 17, 2013, Mother filed an Answer to Father's Petition to Modify Custody, requesting an increase in her time and a reduction in Father's custodial time with the Children.

29. On September 27, 2013, the Parties were ordered to participate in an Updated Custody Evaluation with Dr. Thomas in consideration of Father's remarriage and the addition of Father's step-children into the children's lives. Father objected to his Order and petitioned the Court for the removal of Dr. Thomas, a motion that was denied. Dr. Thomas completed the report, which is part of the record and is dated February 12, 2014. Dr. Thomas recommends Mother continue to have primary physical custody.

30. In 2014, Father filed for Special Relief, seeking to have the minor children attend kindergarten in the Spring-Ford School District despite the fact that Mother had primary custody and the parties had agreed to raise their children in the Daniel Boone School District where mother was raised and is living. This Relief was denied by this Court.

31. On January 6, 2015, this Court appointed Claire Monfaro, M.A.-L.P.C. of Berkshire Psychiatric to perform counseling for the minor children.

32. Ms. Monfaro has recommended that counseling of the minor children continue.

33. Ms. Monfaro testified to lack of communication and co-parenting.

34. On March 2, 2015, per Father's request, this Court appointed Lauren Marks, Esq. Guardian ad Litem ("GAL"), with Father paying 100% of the costs.

35. The GAL testified that Father is rigid and refuses to accept opinions which do not match his own.

36. The GAL found the minor children have been influenced by Father in their statements regarding equal time with Mother.

37. The GAL did an extensive report and investigation into this case and recommends Mother have primary physical custody.

38. Mother resides in a nice home in an area where she grew up and has numerous neighbors and friends. The minor children have their own room at mother's house.

39. Father and his wife reside in a nice home in Montgomery County in a nice neighborhood. His wife's three minor children are at the home 50 percent of the time. The minor children share a bedroom with each other at Father's home.

40. Since birth, the minor children have attending Reading Pediatrics in Wyomissing, Berks County.

41. Father unilaterally attempted to have a second Pediatrician for the minor children in Montgomery County, Allstar Pediatrics.

42. Allstar Pediatrics informed Father they could only be used in case of emergencies.

43. Father has obsessed with Mother's whereabouts and what is going on in her home by following Mother's friends on social media sites, enlisting the help of a neighbor to sneak into Mother's home to take pictures and by speaking to the minor children.

44. Father has obsessed over minor child's R.F.'s diagnosis of Fructose Intolerance by seeking the opinion of Reading Pediatrics, doctors at Children's Hospital of Philadelphia, doctors at Dupont Medical and a dietician. All agreed that the minor child fructose diet need to me monitored with a good diet.

6

45. Father has allowed his wife A___ F_____ to overstep her bounds as a step-parent by allowing her to attend a Doctor's visit at DuPont without the knowledge of Mother and without the knowledge of the Doctors who have A___ F_____ listed as mother in their reports.

46. Minor child R.F. rarely complains of stomach issue when in the care of Mother but does complain when in the care of Father.

47. Father is oblivious to his controlling nature as is evident of the overabundance of documents, many of which were not in his favor, he submitted to the GAL and various experts in this case.

48. If mother is in need of babysitting for the minor children she uses her parents.

49. The minor children have a loving, bonded relationship with their maternal grandparents.

50. Father does not have a close relationship with his family as is evident by his sister having to contact Mother after the divorce so that she could see and spend time with the minor children.

51. Mother actively participates with the minor children in a variety of school and community functions.

52. Father actively participates with the minor children more at home than the community.

53. During the parties marriage they attended UCC church, however Father decided to have the children baptized catholic.

54. Father has obsessed over a relationship Mother has had off and on again with M__ K_____, from South Carolina. Father insists Mother is going to relocate.

55. Mother has no intentions of relocating. Mother plans on maximizing her Pennsylvania teacher pension for retirement purposes.

56. Father and Mother are not able to effectively co-parent.

7

## II. CONCLUSIONS OF LAW

1. Actions in Child Custody are decided under the Pennsylvania Child Custody Act, 23 Pa.C.S.A. 5321 *et.seq* and the decisional law that flows therefrom.

2. The Court has jurisdiction of the parties, the minor children and the custody issues in this case. See 23 Pa.C.S.A. 5321.

3. The paramount concern in a custody proceeding is the best interest of the minor children. Costello v. Costello, 666 A.2d 1096 (Pa. Super. 1995).

4. In a custody dispute, the trial court is to determine what is in the best interest of the minor children, considering the "facts and circumstances having impact on the children's physical, intellectual, moral and spiritual well-being." Johnson v. Lewis, 870 A.2d 368, 371 (Pa. Super. 2005).

5. In ordering any form of custody, the court shall determine the best interest of the child under of the sixteen factors enumerated in 23 Pa.C.S.A §5328. In doing so, the Court is to give weight to those factors that which affects the children's safety. *23 Pa. Cons. Stat. Ann. § 5328 (West)*.

## III. DISCUSSION

Father is seeking to modify the Custody Order to obtain primary custody of the minor children. Mother is likewise seeking to increase her physical custody time with the children. In making disposition, the Court considered the testimony of the parties, Father's wife, A███ F█████, Father's colleague, Maryann Christy, Gary Steppler, the children's maternal grandfather, H███ S██████, the children's maternal grandmother, counselor, Frank Scavo, A███ F██████ father, C███ M█████, M.S., L.P.C., Guardian *Ad Litem*, Lauren Marks, Esq. (" the

8

GAL"), the expert testimony of Dr. Peter Thomas, and Dr. Shanken-Kaaye and all of the
Exhibits of the parties.

(1) *Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.*

Mother is more likely to encourage and permit frequent and continuing contact between the minor children and Father.

Father has played word games with the wording of the telephone contact provisions of the Custody Order. Mother avers that Father routinely does not comply with the phone call provision of the Custody Order. Father's own testimony indicated that he routinely fails to follow the phone call provision of the Custody when the Children are in his care by putting the Children to bed at 7:00 p.m. Father testified that the children cannot talk to their Mother prior to this time because it is family time. Mother's testified Father does not allow the children to speak with Mother when they are in his custody because it is his time, and that Father does not feel that it is appropriate for him to call the Children when they are with Mother. Father does not dispute this testimony. The GAL's testimony echoed the allegations of Mother.

Another point of contention between the parties involves Mother's family reunion. Mother testified that her family reunion in North Carolina is always the third Saturday of August. She further testified that she and Father always attended this reunion when they were married. This year Father notified Mother that he is taking the girls on vacation over August 15, so the Children will not be able to attend the annual reunion.

(2) *The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.*

9

Mother testified that during the marriage father was emotionally abusive and controlling. In addition she testified that prior to her marriage father slapped her in the face while out to dinner with her parents. Father denied striking mother and minimized the incident. G▆y S▆▆r, maternal grandfather testified, he witnessed the incident whereby Father slapped Mother across the face. This incident was additionally corroborated by the testimony of H▆ S▆▆r, maternal grandmother. Mr. Steppler also testified that he witnessed, on more than one occasion, Father "flicking" the girls on the forehead as a form of discipline. This occurred prior to the parties separating. Mother corroborated this incident. The Court notes that neither the parties nor the Children reported abuse to Dr. Thomas, Ms. Monfaro, nor the GAL. The Court found the testimony of maternal grandfather and maternal grandmother credible. Father's denial or minimization of this incident is damaging to Father's credibility.

The Court also has a concern about what appears to be Father's obsessiveness with the minor child, R.F.'s diagnosis of fructose malabsorption. This concern is discussed in greater detail below. While this factor weighs decisively in favor of Mother, the Court does not believe that the Children are at risk of abuse by either Mother or Father.

(3) *The parental duties performed by each party on behalf of the child.*

Dr. Thomas, in his testimony as well as in his April 4, 2011 Custody Evaluation, provided to the Court that Mother and Father cohabitated with the Children for 16 months after they were born. During that time, Mother was the primary caregiver of the Children. Father took off of work two to three weeks after the birth of the minor children while Mother took off eight weeks. Mother estimates that she performed 70 percent of the childcare work, including getting up in the middle of the night and feeding and dressing the children in the morning. Father related to Dr. Thomas as well as testified before this Court the parental duties were split 50/50, and that Father

10

was the parent who would grocery shop and cook. Both parties agree that bath duties were split evenly. However, mother testified that Father was heavily involved in gambling at that time and spent the majority of his time on the phone. His heavy gambling resulted in the parties incurring significant debt. Maternal Grandfather confirmed Father's gambling addiction and testified that during the course of the parties' marriage he provided a great deal of financial support because of the debt.

Both parties have signed the minor children up for extra-curricular activities. The problem is Father has signed the minor children up for activities in Montgomery County without discussing this with Mother and without giving any concern to the unnecessary commuting for the minor children. The activities Father has signed the children up for are just as available in Berks County as they are in Montgomery County. The Court finds this is another example of Father's inability to act in the best interest of his children. These activities required mother to pick the children up from daycare and rush to Montgomery County so the girls could participate. This left Mother with little choice after work other than eating dinner quickly. Father then attempted to use this against Mother in an attempt to show she refused to follow the recommended diet for minor child R.F.

Mother has been responsible for the minor children's homework as she has had primary custody. Unbeknownst to Mother until this past April, Father was getting a second copy of the homework and making the minor children do the homework twice. Father should know, as an educator, the importance of communicating to Mother what is occurring with the children's school work. While homework in kindergarten may be minor, the Court is concerned that as the girls move forward in their academic years he will continue the same pattern. This is another example of Father's need to control every situation.

11

Mother testified that she participates in a number of community, school and church functions events with the children as well as takes them to parks and museums. The Court finds that the majority of Father's time with the children is spent at home when they are not at their extra-curricular activities.

This factor favors Mother.

(4) *The need for stability and continuity in the child's education, family life and community life.*

As indicated above both Mother and Father have signed the minor children up for a number of extracurricular activities including soccer, swimming, dance, music lessons, ballet, track and horseback riding and cheerleading. However, Father has signed the minor children up for basketball and swimming in Royersford, Montgomery County. In the interest of promoting stability and continuity in the children's lives, the Court feels believes that all of their activities, especially the team sports, should be close to Mother's home, their primary residence. As the girls grow older, having the activities in the same area as their school will foster the strengthening of relationships with her teammates. Once the girls begin to participate in school team sports and activities, they will be doing so in the Daniel Boone School District so it makes sense that these activities should take place in that area now. Moreover, it is unreasonable and inconvenient for the kids to continue to commute a half hour's distance between their school and their extracurricular activities.

The minor children have lived their entire lives in the Daniel Boone School District. They have been attending a daycare that provides transportation to and from their school and is minutes from Mother's residence.

12

When the parties separated mother moved only several blocks from father so this allowed Father to have regular contact with the minor children. Father, without informing Mother voluntarily moved to Montgomery County to be with his now wife, then girlfriend.

Mother has raised the children in the same UCC church she was raised in and the same church she attended while married. Curiously, Father insisted that the Children be baptized Catholic, the same religion as his current wife.

Mother has worked at the same job for the past twenty (20) years and testified that she will continue to work at this employment until she reaches maximum PSEA retirement benefits. Father expressed a baseless concern that Mother was going to relocate to South Carolina because she is in a relationship with an individual named M█ K██████. Mother testified that this is an on again off again relationship and she has not introduced the girls to Mr. K█████. Father is so obsessed with this notion that he stalks the Facebook pages of Mother's friends to find any information he can find about M██ K██████. He even enlisted the aid of Mother's best friend's husband who went through his wife's phone to find a phone number of M██ K██████.

Father, on the other hand, had some conflict as a coach at his last employment and was removed from that coaching position. While there was no testimony as to why he no longer had his teaching employment, the court notes he has only been with his current employer for eleven (11) years. This factor favors mother.

(5) *The availability of extended family.*

The GAL testified, and it is undisputed that the Children love step-mother and step-siblings and the love is reciprocal. However, this Court finds that step-mother has overstepped her role on more than one occasion. In addition to step-mother and step-siblings, Father's has two sisters live in Indianapolis, Indiana and his brother lives in Long Island, New York. The

13

paternal grandmother lives in Delaware. Father's parents live near Scranton, PA and they visit the twins once every 3 weeks. However, this Court finds that father does not maintain a close relationship with his family. Mother testified that Father's sister contacted her after the divorce and informed Mother that she had not seen the minor children and could she stop by Mother's home. Mother welcomed her former sister-in-law to her home. The visit went well and sister-in-law extending her visit to an overnight visit. When father learned of this visit he had his current wife confront Mother to tell Mother she was out of line. This Court commends Mother for fostering a relationship between the minor children and their Aunt.

As for Mother's side of the family, the minor children enjoy a close relationship with maternal grandparents. The maternal grandparents live in close proximity from Mother's residence and visit with the Children on a regular basis. They have been heavily involved in the children's lives, especially prior to the parties' separation. Father testified that the maternal grandparents were so involved in raising the girls that at times, they were overbearing. Maternal Grandmother testified that following the birth of the minor children Father informed them they had to make an appointment to come over to the house. In addition Maternal Grandmother testified that she had family that had traveled from out of town to bring a present and see the minor children and Father would not allow them in the home. The Court found the maternal grandparents' testimony to be credible regarding the existence of a strong bond between them and the girls and the Father's control over blocking visitation of family.

Father has continued to stop the minor children with visits with extended family by his scheduling of vacation over the time period which he knows is always Mother's family reunion that she attends each year. This is yet another example of Father's passive aggressive behavior.

14

The parties live approximately 30 to 40 minutes apart from one another and the Children will have the opportunity to continue their relationships with the extended family of both Mother and Father. The Court's custody decision will not preclude the children from continuing to have a relationship with the parties' extended family. This factor weighs in favor of Mother.

(6) *The child's sibling relationships*

As stated above, by all accounts the minor children have a loving, quality relationship with the three step-siblings. The GAL, in her home observation of Father's house, observed that the twins and the step-children interacted and played together. T.M., one of the step-children, wrote a letter to the GAL in which he expressed that he wishes the minor children would be able to stay with Father more often. The Court found this letter, even if it was well intentioned, to be inappropriate given the ongoing custody proceedings. The Court found this letter to be evidence of the ongoing discussions of the custody dispute in Father's household. The GAL concluded, and the Court cannot disagree, that "[i]t is clear that the children all have an excellent relationship." However, it is evident to the Court that in the coming years, the children's interaction with the step-siblings may be minimal. The girls and their step-siblings are already busy with various extracurricular activities and will only become busier as they grow older. In addition, A⬛⬛F⬛⬛n has a 50/50 custody arrangement with her children which does not necessarily coincide with Father's custodial time. Furthermore, Father testified that all of the children have a staggered bedtime. The minor children's bedtime in his household is 7:00 p.m. The children are unavailable to talk with Mother prior to bedtime because he is doing his family time. This family time cannot be inclusive of the children in the household as they are teenagers participating in middle and high school sports. Therefore, they would only be walking in the door for dinner as the minor children or going to bed. If the step-children have games scheduled

15

on a school night they would not see the minor children at all. The Court further recognizes that these children are not the biological children of Father and are not always at Father's residence. Therefore the Court gives minimal weight to this factor as far as custody during the school week.

(7) *The well-reasoned preference of the child, based on the child's maturity and judgment.*

The Court did not take testimony from the minor children since they are only six (6) years old. The Court had previously appointed a guardian at litem for the minor children who did a thorough investigation, testified and filed an extensive report. The Court agrees with the GAL, the Children are not old or mature enough to make a well-reasoned decision or judgment as the where they want to reside. By all accounts, including Dr. Thomas' report, and the testimony of Ms. Monfaro, the Children are bonded and love Mother and Father.

(8) *The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.*

Mother believes that Father is talking to the minor children regularly about the custody arrangement. Father, likewise believes mother is talking to the minor children. The Court finds that both parties may be speaking to the children, however this Court finds that Father in addition to directly speaking to the minor children is also using his step-children to manipulate them and discuss the custody arrangement. Father testified that his wife and her ex-husband have recently agreed to a 50/50 custody arrangement. Father testified that the minor children ask why they have to leave the home when the step-children get to stay and they also want 50/50. This Court finds that the minor children are too young to understand what a 50/50 custody agreement is and the more appropriate conversation would be that all the children switch between parent's homes. This Court also does not find credible Father's testimony that the minor children come to him and provide him with detailed information about what happens at Mother's home. This Court

16

finds that Father is constantly questioning the minor children as to what is occurring in Mother's home. An example is Father's exaggerated testimony that Mother has left the children at home alone. The Court finds Mother's testimony credible that she was merely outside talking in the neighbor's next door driveway which was within earshot and eyeshot of her home.

This Court finds that Father is obsessed with what Mother is doing on a regular basis even when she does not have the children. Father constantly watches Mother's best friends Facebook page to see if he can find out information on Mother. In addition Father has enlisted Mother's best friend's husband to go into Mother's home while she is not there to take pictures, to inform him of where Mother is going even when Mother does not have custody of the children. When Father found out that Mother and her best friend went to dinner on a regular basis when she did not have the minor children, Father went so far as to state that he was considering trying to get the receipts from the restaurant to see what Mother had to drink. Father's behavior is borderline stalking. This Court fears that Father will continue to question the minor children and would not be surprised if he begins to include the minor children in spying on Mother. Dr. Thomas opined that Father presents as intense with obsessive qualities, controlling in his behaviors and his personality structure is not particularly strong for nurturing events.

In addition, The GAL provided in her report that the twins are caught in the middle of the feuding parents. They play up to each parent. For example, R.F. complains to Mother about attending a dietician and then cries to Father that her stomach hurts.

As discussed in more detail below, R.F. has gastrointestinal issues and has been diagnosed with fructose malabsorption. R.F.'s condition requires the parties to monitor her diet to ensure she limits the amount of fructose she consumes. As relevant under this factor, when R.F. is with Father after being with Mother, Father questions her to the degree that he is "drilling" her about

17

what Mother had fed her while with Mother. Father went as far as to take pictures of the interior of the children's book bags to see what food Mother was sending them to school with. This factor weighs in favor of Mother.

> (9) *Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.*

Both parties are loving, stable, and maintain consistency in their lifestyles and with their interaction with the children. Dr. Thomas, in his reports, opines that Mother presents with personality structure that is positive for nurturing events and moments, and that her overall skills for nurturing functions were good. Mother seems to be consistent with her punishment of the Children and does so by making the children sit in "timeout," apologizing and then tell her how they could have made a better behavioral choice. Dr. Thomas concluded that Mother displays a better capacity for nurturing than Father. The girls indicated feeling somewhat closer and more comfortable to Mother than Father.

As Dr. Thomas explained in his 2014 report, Father, is a better taskmaster and problem solver than he is a nurturer. Dr. Thomas opined that Father's personality structure is not particularly strong for nurturing events. Father's responses to Dr. Thomas' hypothetical questions were more focused on problem solving rather than nurturing. Father will typically take away a snack from the Children as a punishment. Father has some difficulty with managing conflict with other people. This manifested, for example, when Father had a conflict with the children's daycare employees. The Court agrees with Dr. Thomas and this factor weighs in favor Mother.

> (10) *Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.*

18

Another point of contention between the parties concerns R.F.'s gastrointestinal issues. R.F. has been diagnosed with fructose malabsorption which requires limiting the amount of fructose that R.F. consumes. While Father appears to obsess over this disorder perhaps to a fault, the Court believes that he does so with the best interest of her health in mind. Father closely regulates and monitor's R.F.'s diet, and strictly and rigidly follows the diet plan prescribed by the doctors and nutritionist. Mother feels that R.F. is playing up her stomach problems when she is with Father and that R.F. does not voice similar complaints when with Mother. Father believes that strict compliance with a fructose free diet is critical to R.F.'s physical development and well-being and that Mother's lack of strict coherence is harmful to R.F. Father has obsessed over this diagnosis to the point he has a chart prepared for daycare so that they can document her bowels movements. When he did not like the diagnosis from one expert, the doctors at CHOP he took her to DUPONT without notify mother. What is also concerning is that the doctors notes from DUPONT reflect mother was present, when in fact it was step-mother who was present. Following the diagnosis with DUPONT Father continued by scheduling an appointment with a dietician. Mother indicates that she has gone along with Father's request to see a dietician and the dietician's recommendations, even though she believes this to be unnecessary in light of the recommendations from the pediatrician and the doctors at CHOP and DUPONT.

This Court agrees with the concerns expressed by the GAL and Mother that the minor child R.F. is aware of the differences of opinions between the parties and therefore complains about her stomach in the presence of Father but not in front of Mother.

Father has concerns with the quality of education at the Daniel Boone School District, the school district where the custodial mother resides. Father testified that he believes better options would be available in the school district of his home. Father never expressed these concerns

19

when the parties were married and chose to build and raise their children in the Daniel Boone School District. Father referenced a letter in the newspaper that discussed layoffs at the school district. Father, as an employee of a public school should be aware that there are turnovers in school personnel at every school. In addition, Father admitted during testimony that the success of a child in large part depends on their home environment.

Both parents spend time reading with the children. As stated above, Mother appears to be the parent who socializes the minor children on a regular basis with activities and friends outside of the home, whereas Father and his wife tend to spend time with the minor children at home.

(11) *The proximity of the residences of the parties.*

Mother lives in Berks County and Father lives in Montgomery County. The parties' residences are approximately 30-40 minutes apart. This is significant to the Court because the current custody schedule was entered when the children were not school age. In addition the current order requires the parties to exchange the children 2 or 3 times per week. Given the distance between the residences, this is too much back and forth and too much time spent in the car for the minor children during the school week. This 30-40 minute commute on a school morning will require the children to rise earlier than necessary to get to daycare. This factor weighs in favor of Mother as Father voluntarily chose to relocate.

(12) *Each party's availability to care for the child or ability to make appropriate child-care arrangements*

As stated above, both of the parties are full-time teachers with very similar work schedules. Each works from approximately 7:30 a.m. to 3:30 p.m. Monday through Friday and each has the summers off. The minor children have been attending St. Paul's Daycare which provides transportation to and from school. When Mother is need of any assistance with the minor

20

children her parents help. Father has the assistance of his wife. Again this factor weighs in favor of Mother as Father voluntarily chose to relocate.

(13) *The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.*

The level of conflict between the parties and their refusal to cooperate with one another is the driving force behind many of the issues in this case. The parties cannot come to an amicable agreement as to issues as simple as phone calls, R.F.'s diet, or conflicts in vacation. Mother testified that Father will only cooperate if things are done his way. She further testified that she has given into him on a number of occasions over the years just to avoid conflict. The testimony provides that the parties were amicable, communicative and cooperative in the first few years immediately following their separation. In recent years, their relationship has soured. The Court agrees with the GAL's report: the minor children are caught in the middle of their bickering and squabbling parents.

Ms. Monfaro testified she did not recommend co-parenting counseling because the parties are so entrenched in their animosity towards one another. Father sent a voluminous amount of documents to Ms. Monfaro as well as to the GAL. The conflict between the parents is having an effect on the children as well. R.F. acted out against Ms. Monfaro during a counseling session. She told Ms. Monfaro that she hated her and tried to twist her hair. Ms. Monfaro believes that this outburst is a result Mother and Father's contentious relationship with one another. Dr. Thomas also opines in his report that "the most prominent dysfunction in this family is the continuing inability of Mother and Father to co-parent." He further observed, and the Court agrees, "slight changes in the custody program will not have anywhere near the impact that the quality of the co-parenting relationship that mother and father have. In other words, if mother

21

and father want to improve the girls' future experience, their focus should be on co-parenting, establishing a better communication system, etc. and not on additional custodial days."

Father is also very rigid about a bedtime of 7pm with the minor children, despite that mother's bedtime is between 8 – 8:30 p.m. Father was so rigid with this bedtime that he acknowledged ignoring the court order that provided Mother with phone contact between 7:40 and 8:00 p.m.

The parties' inability to effectively co-parent is a significant factor here in reaching a custody schedule decision. The Court believes that fewer custody exchanges are appropriate here to minimize the frequency of interaction between Mother and Father.

(14) *The history of drug or alcohol abuse of a party or member of a party's household.*

Father accuses Mother of having an issue with alcohol consumption. As evidence, he provided Facebook posts, pictures and text messages from her friends and neighbors. The Court found credible the testimony of Mother and maternal grandparents who all testified that Mother drinks socially and does not get intoxicated while with the Children. Mother further testified that Father does not approve of drinking and when they were married she needed his permission to have a glass of wine. This Court also incorporates the findings above relative to Father obsessing over this issue of mother going to dinner with her friend and his thought about attempting to get the receipts from the restaurant. The Court believes that there is no issue with Mother's alcohol consumption.

(15) *The mental and physical condition of a party or member of a party's household.*

According to Dr. Thomas' report, Mother and Father presented without any signs of mood or thought disorder. In addition, both parties appear to be in good physical health, and no physical health problems were alleged or are of record. Dr. Thomas opined that Ms. Thomas did not

22

present as an aggressive, or particularly powerful individual and by her own admission, she can be passive-aggressive. At times, while raising and disciplining the Children, she can be a pushover. Father, on the other hand, presented to Dr. Thomas as an intense, sometimes obsessive, sometimes angry personality with an undercurrent of anxiety. He sets high expectations and pushes for those expectations to be met. Although he means well, Mr. Feldman's intensity and assertiveness can come across as undiplomatic and he tends to be often involved in confrontations. As previously stated, Father has caused issues at the Children's daycare. In addition, there was an incident involving Mother's neighbors, Mr. and Mrs. W███. Mother and Mrs. W███ are close friends. When Mother was away from her house for an extended period of time, the W███ went to her house to feed her fish while Mother was gone. While in the house, Mr. W███, at the encouragement of Father who wanted to know if the children were being locked in their rooms, went upstairs and took photographs of the children's bedroom doors and texted the pictures to Father. Mother first learned during trial that Mr. W███ had been in her home on more than one occasion. In addition Mr. W███ was subpoenaed on behalf of Father, however refused to honor that subpoena. The Court finds this intrusion of Mother's privacy disturbing, borderline stalking and reflective of Father's overall controlling personality. This factor weighs in favor of Mother.

(16) *Any other relevant factor.*

After reviewing Dr. Thomas' report, Father hired his own expert, Dr. Shanken-Kaye to perform a critique of the report. In critiquing Dr. Thomas' report, Dr. Shanken-Kaye did not conduct any of his own interviews of the participants in the custody action. He did however, review the 2011 and 2014 reports of Dr. Thomas, along with the testing data, Dr. Thomas' files which contained notes and other materials submitted to Dr. Thomas. In his report, Dr. Shanken-

23

Kaye's major criticism of the reports are: 1. Dr. Thomas did not specifically address each one of the 16 factors of 23 Pa.C.S.A §5328; and 2: Dr. Thomas did not commit enough hours to interviews and observations of the involved parties to produce a competent and accurate recommendation.

First, 23 Pa.C.S.A. § 5328 mandates the Court to consider the 16 factors in making a custody determination. By its plain language, the statue applies only to the courts and it does not require a custody evaluator to do the same. Next, on rebuttal, Dr. Thomas testified that he in fact invested many more hours than Dr. Shanken-Kaye realized in interviewing, observing, and analyzing the instant custody evaluation than is required by the rules and ethics of psychiatry. In addition Dr. Shanken-Kaye testified that he did not know if Dr. Thomas's report was or was not accurate. Thus, while Dr. Shanken-Kaye was permitted to testify, the Court disagrees with his assertions and no weight was given to his testimony.

J█████ F████████                           : IN THE COURT OF COMMON PLEAS
                    PLAINTIFF               : OF BERKS COUNTY, PENNSYLVANIA
                                            : CIVIL ACTION – LAW
                    V.                      :
                                            : No. 10-15544
J████ F███████                             : ASSIGNED TO: M. THERESA JOHNSON, J.
                    DEFENDANT               : CUSTODY

---

### FINAL CUSTODY ORDER

---

AND NOW, this 13th day of August, 2015, it is hereby ORDERED and DECREED that J██ F█████, "Mother" and J██ F██████, "Father" shall have shared legal custody of the minor children A██████ C███ F█████, born April 21, 2009; and R██ G███ F██████, born April 21, 2009. Mother shall have primary physical custody. Father shall have partial physical custody of the minor children as follows:

1. During the School year –
   a. Father shall have partial physical custody of the minor children, A.F. and R.F., every other weekend from Friday at 6:00 P.M. until Sunday at 6:00 P.M.
   b. Father shall have every Wednesday from 4:30 p.m. to 6:30 p.m.

2. Father shall be responsible for picking up the minor children from Mother's residence and returning the minor children to Mother's residence. Father shall also be responsible for feeding the children dinner on the evening he has them from 4:30-6:30 p.m.

3. During the summer, which shall begin on a Monday of the first full week the minor children are out of school to the last Friday before school begins, the parties shall rotate custody on a week on week off basis from Monday at Noon to the following Monday at Noon. The custody period shall begin so that it corresponds with Mother's ability to attend her family reunion. Vacation time shall be scheduled in accordance with the custodial time within this paragraph.

4. **TRANSPORTATION** During the summer months and holiday schedule the party whose custody period is beginning will be responsible for picking up the minor children at the other parties residence.

25

5. **HOLIDAYS** The parties shall alternate custody on the following holidays: Easter, Memorial Day, July 4th, Labor Day and Thanksgiving. Father shall begin with Labor Day in 2015 and the parties shall alternate the holidays thereafter. Custody shall be from 10:00 A.M. until 7:00 p.m.

6. **MOTHER'S DAY/FATHER'S DAY** Mother shall have custody for Mother's Day and Father shall have custody for Father's Day each year. Custody shall be from 10:00 A.M. until 7:00 P.M.

7. **CHRISTMAS** The parties shall share custody for the Christmas holiday with one parent having custody from NOON on December 24 until NOON on December 25th and the other parent having custody from NOON on December 25 until NOON on December 26th. Mother shall have custody from the Christmas Eve to Christmas morning time period in odd numbered years, Father shall have custody from the Christmas Eve to Christmas morning time periods in even numbered years.

8. **TRAVEL** If a party intends to travel with the minor children out of Pennsylvania, they shall provide the other party with the address and phone number where the children can be located.

9. **EXTRA-CURRICULAR ACTIVITES** Shall take precedence over the visitation schedule and registration of these activities will occur with Berks County activities/teams. The parent who registers the child is to ensure that the other parents e-mail and phone number is included on the registration so that parent may also receive information. This should help alleviate conflict over one party being responsible for providing the other party with schedules and/or information from the activity.

   A. Transportation to and from extracurricular activities will be the responsibility of the party who has custody. Both parties are to encourage participation in extracurricular activities.

10. **REASONABLE TELEPHONE CONTACT**: The custodial parent shall maintain an open phone line from 6:00 p.m. to 6:45 p.m. each evening so that the child may place phone calls to or receive calls from the non-custodial parent. Any missed phone calls shall be returned prior to the children going to bed that evening. Neither party shall use Caller ID, Call Block or any other device or service which limits telephone access to

26

the child. Neither party may limit the amount of time the party speaks to the minor children.

11. **RELOCATION** If you are planning to relocate with the children and your relocation will significantly impair any party's exercise of their custodial rights, you are obligated to provide a detailed notice and counter-affidavit by certified mail, return receipt requested to all individuals who have custody rights to the children at least 60 days in advance of the proposed relocation in compliance with 23 Pa. C.S.A Section 5337.

12. This Order shall be a Final Order resolving the issues raised in the Custody Complaint filed December 8, 2010.

13. The attached Appendix shall be made part of the within Order.

BY THE COURT:

M. Theresa Johnson, J.

<u>Certified Distribution</u>
☒ Prothonotary (original)
☒ Computer
☒ Judge
☒ Attomey for the Plaintiff:        Randy Raebenold, Esq.
☐ Plaintiff:                        _____
☒ Attomey for the Defendant:        Tina Boyd, Esq.
☐ Defendant:                        _____
X  Guardian                         Lauren Marks, Esquire

BERKS COUNTY, PA
MARIANNE R SUTTON
PROTHONOTARY
2015 AUG 13 P 3 50
RECEIVED
PROTHONOTARY'S OFFICE

27